MARC J. WINTHROP – State Bar No. 6321
mwinthrop@winthropcouchot.com
KAVITA GUPTA – State Bar No. 138505
kgupta@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile:   (949) 720-4111

General Insolvency Counsel for Debtor and
Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>CRYSTAL CATHEDRAL MINISTRIES,<br>a California nonprofit corporation<br><br>Debtor and<br>Debtor-in-Possession. | Case No. 8:10-bk-24771 RK<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S DISCLOSURE STATEMENT**<br>**DESCRIBING CHAPTER 11 PLAN OF**<br>**REORGANIZATION**<br><br>**Disclosure Statement Hearing**<br>DATE:     July 13, 2011<br>TIME:     11:00 a.m.<br>PLACE:   Courtroom 5D<br>             411 West Fourth Street<br>             Santa Ana, CA 92701 |

<u>**THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE**</u>

<u>**BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR**</u>

<u>**REJECTIONS OF ANY PLAN.  IT IS SET FOR HEARING ON JULY 13, 2011.**</u>

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

# TABLE OF CONTENTS

| I. | INTRODUCTION | 2 |
|---|---|---|
| II. | DEFINITIONS AND RULES OF INTERPRETATION | 7 |
| | A. Definitions | 7 |
| | B. Rules of Construction | 17 |
| | C. Exhibits | 18 |
| III. | CONFIRMATION AND VOTING | 18 |
| IV. | BACKGROUND OF THE DEBTOR | 20 |
| | A. The Debtor | 20 |
| | B. Financial Performance of the Debtor | 20 |
| | C. Pre-Petition Legal Proceedings | 20 |
| V. | THE DEBTOR'S CHAPTER 11 PROCEEDING | 21 |
| | A. Events Precipitating the Debtor's Chapter 11 Filing | 21 |
| | B. Debtor-in-Possession Status | 23 |
| | C. The Automatic Stay | 23 |
| | D. Significant Events Which Have Occurred Since the Petition Date | 23 |
| | E. Actual and Projected Recovery of Preferential or Fraudulent Transfers | 25 |
| | F. Sale of Assets and Bid Procedures | 26 |
| | G. Projected Objections to Claims Filed Against the Estate | 26 |
| VI. | FINANCIAL INFORMATION REGARDING THE DEBTOR | 27 |
| | A. Historical Financial Information | 27 |
| | B. Financial Information Provided During the Case | 27 |
| | C. Financial Performance During the Case | 28 |
| VII. | DESCRIPTION OF THE PLAN OF REORGANIZATION | 28 |
| | A. Basic Structure of the Plan | 28 |
| | B. Classification and Treatment of Claims | 28 |
| VIII. | UNCLASSIFIED CLAIMS | 29 |
| | A. Administrative Claims | 29 |
| | B. Priority Tax Claims | 31 |
| | C. Amount of Priority Tax Claims | 31 |
| IX. | CLASSIFICATION OF CLAIMS | 32 |

| | A. | General Overview ........................................................................ | 32 |
| | B. | Designation of Classes............................................................... | 32 |
| X. | | TREATMENT OF CLAIMS ............................................................... | 33 |
| | A. | Treatment of Class 1.1 - Los Angeles County Treasurer and Tax Collector ............................................................................ | 33 |
| | B. | Treatment of Classes 1.2 and 1.3 - F&M and Grant & BCG, LLC ............ | 33 |
| | C. | Treatment of Classes 1.4 - GE Capital Public Finance, Inc ........................ | 33 |
| | D. | Treatment of Classes 1.5 and 1.6 - Canon Financial Services, Inc. and PNC Equipment Finance, LLC ..................................................... | 34 |
| | E. | Treatment of Secured Class 1.7 - Allowed Secured Claim of Credit Management Association in Trust for Creditors ............................. | 36 |
| | F. | Treatment of Secured Class 1.8 - Allowed Secured Claim of Morgan Stanley Bank, N.A. ................................................................... | 36 |
| | G. | Class 1.9 – Allowed Secured Claim of Toyota Motor Credit Corp.............. | 36 |
| | H. | Class 2 - Allowed Priority Unsecured Claims ........................................ | 37 |
| | I. | Class 3 – Allowed General Unsecured Claims........................................ | 37 |
| | J. | Class 4 – Subordinated Claims of Insiders ........................................... | 38 |
| | | MEANS OF IMPLEMENTING THE PLAN ............................................... | 38 |
| | A. | Introduction.............................................................................. | 38 |
| | B. | Management/Board of Directors/Executive Committee ........................ | 38 |
| | C. | Compensation of Insiders ............................................................ | 39 |
| | D. | Compensation of Dr. Sheila Schuller Coleman....................................... | 39 |
| | E. | Compensation of the Chief Financial Officer ....................................... | 39 |
| | F. | Corporate Actions...................................................................... | 39 |
| | G. | Transfer of Estate Property to Reorganized Debtor................................ | 40 |
| | H. | Funding of the Plan..................................................................... | 40 |
| | I. | Post Confirmation Committee ......................................................... | 44 |
| | J. | Compliance with California State Law Governing the Transfer of Property by a Nonprofit Corporation ............................................... | 44 |
| | K. | Avoidance Actions ..................................................................... | 45 |
| | L. | Disposition of Assets .................................................................. | 45 |
| | M. | Compromise of Controversies ....................................................... | 45 |
| | N. | Bankruptcy Court Approval Relative to Post-Confirmation Matters ............ | 46 |
| | O. | Debtor's Right of Setoff ............................................................... | 46 |
| | P. | Cash Payments ......................................................................... | 46 |
| | Q. | Reorganized Debtor's Certification ................................................... | 47 |
| XII. | | DISTRIBUTIONS ........................................................................ | 47 |
| | A. | Distribution Agent ..................................................................... | 47 |
| | B. | Distributions ............................................................................ | 47 |
| | C. | Instruments .............................................................................. | 48 |
| | D. | De Minimis Distributions .............................................................. | 48 |
| | E. | Delivery of Distributions .............................................................. | 48 |

F.      Undeliverable Distributions...................................................................... 49
G.      Disposition of Unclaimed Property ........................................................ 49

XIII.   OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ......................................... 49

Objections to Claims ............................................................................................. 49
Schedule of Disputed Claims ................................................................................ 20
Treatment of Disputed Claims............................................................................... 50

XIV.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................ 51

A.      Executory Contracts Being Assumed ..................................................... 51
B.      Payment of Cure Claims......................................................................... 52
C.      Executory Contracts Being Rejected ...................................................... 52
D.      Retention of Property Rights By Reorganized Debtor ........................... 53
E.      Bar Date for Rejection Damages ........................................................... 53
F.      Claims Schedule ..................................................................................... 53

XV.     TAX CONSEQUENCES OF PLAN ........................................................................ 54

A.      Introduction............................................................................................. 54
B.      Federal Income Tax Consequences to the Debtor ................................. 55
C.      Tax Consequences To Creditors.............................................................. 55

XVI.    CONFIRMATION REQUIREMENTS AND PROCEDURES................................ 55

A.      Introduction............................................................................................. 55
B.      Who May Object to Confirmation of the Plan........................................ 56
C.      Who May Vote to Accept/Reject the Plan.............................................. 56
D.      Who Is Not Entitled to Vote .................................................................. 56
E.      Who Can Vote in More Than One Class................................................ 57
F.      Votes Necessary to Confirm the Plan .................................................... 57
G.      Votes Necessary for a Class to Accept the Plan .................................... 57
H.      Treatment of Non-Accepting Classes..................................................... 57
I.      Request for Confirmation Despite Non-Acceptance by Impaired Class(es) 58
J.      Liquidation Analysis............................................................................... 58
K.      Feasibility ............................................................................................... 62

XVII.   EFFECT OF CONFIRMATION OF PLAN............................................................. 65

A.      Discharge ................................................................................................ 65
B.      Injunction................................................................................................ 65

XIII.   LIMITATION OF LIABILITY AND RELEASES ................................................. 66

A.      No Liability for Solicitation or Participation.......................................... 66
B.      Limitation of Liability ............................................................................ 67

XIX.    CONDITIONS TO CONFIRMATION AND EFFECTIVENESS ............................ 67

    A.    Conditions Precedent to Plan Confirmation ................................................ 67
    B.    Condition Precedent to Plan Effectiveness ................................................. 67
    C.    Waiver of Conditions ................................................................................. 68

XX.    RETENTION OF JURISDICTION ........................................................................ 68

XXI.    MODIFICATION OF THE PLAN; CRAMDOWN ................................................ 70

    A.    Modification of the Plan ............................................................................. 70
    B.    Nonconsensual Confirmation ..................................................................... 70

XXII.    MISCELLANEOUS ............................................................................................... 70

    A.    Payment of Statutory Fees ......................................................................... 70
    B.    Payment Dates ............................................................................................ 71
    C.    Other Documents and Actions .................................................................... 71
    D.    Notices ........................................................................................................ 71
    E.    Governing Law ........................................................................................... 72
    F.    Binding Effect ............................................................................................. 72
    G.    Successors and Assigns .............................................................................. 72
    H.    No Waiver ................................................................................................... 72
    I.    Inconsistencies ........................................................................................... 72
    J.    Exemption from Certain Transfer Taxes and Recording Fees ..................... 72
    K.    Post-Confirmation Status Report ................................................................ 73
    L.    Post-Confirmation Conversion/Dismissal .................................................. 73
    M.    Changes in Rates Subject to Regulatory Commission Approval ................. 73
    N.    Final Decree ................................................................................................ 73

XXIII.    CONCLUSION ....................................................................................................... 74

# I.

## **INTRODUCTION**

Crystal Cathedral Ministries, a California nonprofit corporation ("Debtor"), the debtor and debtor-in-possession herein, commenced its case by filing a voluntary Chapter 11 petition on October 18, 2010 under the United States Bankruptcy Code ("Bankruptcy Code"). Chapter 11 allows the Debtor, and under some circumstances, creditors and others parties-in-interest, to propose a plan of reorganization ("Plan"). The Debtor is the party proposing the Plan sent to you in the same envelope as this document. Since the Petition Date, the Debtor has continued to operate its ministry in the ordinary course as a debtor-in-possession.

The document that you are reading is the Debtor's Disclosure Statement. This Disclosure Statement is furnished for the purpose of soliciting acceptances to the Debtor's Plan which has been filed with the Bankruptcy Court. A copy of the Plan accompanies this Disclosure Statement.

Section 1125[1] of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement. The purpose of this Disclosure Statement is to provide adequate information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor to make an informed judgment about the Plan and to enable such Creditor to determine whether it is in its best interest to vote for (accept) or against (reject) the Plan.

This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtor urges you to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets and liabilities, projected financial performance, and sets forth a summary of the Plan.

---

[1] Section 1125(b) provides, in pertinent part, as follows:
An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

1    This Disclosure Statement does not purport to be a complete description of the Plan, the

2   financial data pertaining to the Debtor's operations, the applicable provisions of the Bankruptcy

3   Code, or any other matters which may be deemed significant by Creditors.  Out of practical

4   necessity, this Disclosure Statement represents an attempt to summarize extensive overall data,

5   legal documents and legal principles, including provisions of the Bankruptcy Code, and set them

6   forth in understandable, readable form.  Thus, although the Debtor has attempted to describe fairly

7   and accurately the matters set forth and discussed in this Disclosure Statement, the Debtor

8   emphasize that the documents and instruments referred to or summarized in this Disclosure

9   Statement (including, without limitation, historical financial information for the Debtor's

10   operations) are available for inspection at the office of the Debtor's attorneys, Winthrop Couchot

11   Professional Corporation ("Winthrop Couchot"), located at 660 Newport Center Drive, Suite 400,

12   Newport Beach, CA 92660 (Attn: Marc J. Winthrop, Esq.), during normal business hours, and

13   upon reasonable written request made prior to the Confirmation Hearing.

14    To vote to accept or reject the Plan, a Creditor must indicate its acceptance or rejection

15   thereof on the ballot which accompanies this Disclosure Statement and return it to Winthrop

16   Couchot Professional Corporation in the envelope provided, by facsimile (949) 720-4111, or

17   email (pj@winthropcouchot.com), such that the ballot is actually received by Winthrop Couchot

18   by 4:00 p.m. Pacific Daylight Time on _____ 2011.  Each Class of Creditors allowed to

19   vote on the Plan will be deemed to have accepted the Plan if the Plan is accepted by valid ballots

20   cast by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one

21   half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan.

22   **ONLY PROPERLY EXECUTED BALLOTS TIMELY RECEIVED BY THE DEBTOR'S**

23   **COUNSEL WILL BE COUNTED AS HAVING VOTED ON THE PLAN.**

24    Since mail delays may occur, and because time is of the essence, it is important that ballots

25   be mailed well in advance of the date specified hereinabove as the deadline for Winthrop Couchot

26   to receive ballots.  Any ballots received after that date will not be included in any calculation to

27   determine whether the Debtor's Creditors have accepted or rejected the Plan.

28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1        At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to

2    Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary

3    Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should,

4    nevertheless, confirm the Plan.  If at such hearing the Bankruptcy Court should determine that the

5    Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the

6    Bankruptcy Court will enter a Confirmation Order.  Pursuant to Section 1141 of the Bankruptcy

7    Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding

8    upon the Debtor and each of its Creditors, regardless of whether the Creditor voted to accept the

9    Plan.

10        Pursuant to the Section 1128 of the Bankruptcy Code, any party-in-interest may object to

11    the confirmation of the Plan.  The Bankruptcy Court has fixed _____2011 as the deadline for

12    filing an objection to the Plan and for serving a copy thereof upon the Debtor's attorneys,

13    Winthrop Couchot, at the address set forth hereinabove (Attn: Marc J. Winthrop, Esq.); upon the

14    Committee's attorneys, Ringstad & Sanders, LLP located at 2030 Main Street, Suite 1200, Irvine,

15    California 92614 (Attn: Nanette D. Sanders, Esq.); and upon the United States Trustee, located at

16    411 West Fourth Street, Suite 9041, Santa Ana, California  92701 (Attn: Frank Cadigan, Esq.).

17    **THIS IS A SOLICITATION BY THE DEBTOR.  THE REPRESENTATIONS**

18    **HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR ITS**

19    **OTHER PROFESSIONALS.  NO REPRESENTATIONS CONCERNING THE DEBTOR,**

20    **INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO ITS FUTURE**

21    **BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE VALUE OF ITS**

22    **PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE ESTATE, OR ANY TAX**

23    **EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE**

24    **AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS**

25    **DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE**

26    **TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR**

27    **DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE**

28    **STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-INTEREST.  ANY**

1   SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE

2   REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE

3   INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE

4   BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

5        THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE

6   DEBTOR MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE

7   MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

8   SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A

9   RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

10  FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT,"

11  "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR

12  OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE

13  READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE

14  NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND

15  UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO

16  DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD

17  LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION

18  PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE AND OTHER

19  INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING,

20  AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE

21  AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE,

22  ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO

23  BE ACCURATE.

24        UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE

25  INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE

26  STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  RECORDS KEPT BY THE

27  DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED

28  INTERNALLY BY THE DEBTOR.  THE DEBTOR BELIEVES THAT EVERY

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1   REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION

2   AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND

3   HISTORY OF THE DEBTOR'S MINISTRY AND THE CONDITION OF THE DEBTOR'S

4   BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE DEBTOR ARE

5   NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.

6   NEITHER DEBTOR'S CHIEF RESTRUCTURING OFFICER, DEBTOR'S FINANCIAL

7   ADVISOR AND CONSULTANT, DEBTOR'S GENERAL INSOLVENCY COUNSEL, NOR

8   DEBTOR'S CORPORATE COUNSEL VERIFIED INDEPENDENTLY THE

9   INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR

10  WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

11        THE DEBTOR AND ITS PROFESSIONALS HAVE MADE A DILIGENT EFFORT

12  TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION CLAIMS,

13  INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS TO

14  CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A

15  PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS

16  DISCLOSURE STATEMENT.  THE DEBTOR OR OTHER PARTIES-IN-INTEREST

17  MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE POST-CONFIRMATION

18  ESTATE CLAIMS WHETHER OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS

19  DISCLOSURE STATEMENT.

20        ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO

21  CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR

22  TO VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT

23  SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR

24  TAX ADVICE.  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD

25  CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT

26  OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A

27  COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS

28  DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1  CREDITORS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED

2  DECISION REGARDING THE PLAN.

3      THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE

4  STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT

5  CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION

6  OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, ASSUMING THE ACCURACY

7  OF THE CONTENTS OF THIS DISCLOSURE STATEMENT.  THE BANKRUPTCY

8  COURT HAS NOT YET DETERMINED SUCH ACCURACY, BUT MAY DO SO AT THE

9  HEARING REGARDING THE CONFIRMATION OF THE PLAN.

10                                    II.

11                DEFINITIONS AND RULES OF  INTERPRETATION

12  **A.**   **Definitions**.  The following defined terms are used in this Disclosure Statement.

13  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code

14  or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy

15  Code or Bankruptcy Rules.

16      1.    "Administrative Claim" means a Claim for costs and expenses of the

17  administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including,

18  without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or

19  charges asserted against an Estate under 28 U.S.C. § 1930.

20      2.    "Administrative Tax Claim" means a request by a Governmental Unit for

21  payment of Administrative Claims for Taxes (and for interest or penalties related to such

22  Taxes) for any tax year or period, all or any portion of which occurs within the period from and

23  including the Petition Date through and including the Effective Date.

24      3.    "Allowable Interest Rate" means the interest rate that is fixed at one

25  percentage point (1%) over the prime rate of interest as published in the Wall Street Journal on the

26  Effective Date.

27      4.    "Allowed Administrative Claim" means an Administrative Claim allowed

28  pursuant to Sections 503(b) or 507(a)(1) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

-7-

5.    "Allowed Claim" means a Claim that is either (i) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order.  The amount of an Allowed Claim shall be as follows:  (a) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent, unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, shall be zero, and no Distribution shall be made on account of such Claim.

6.    "Allowed Cure Claim" means an Allowed Claim for Cure pursuant to the terms of the Plan and a Final Order.

7.    "Allowed Deficiency Claim" means that portion of an Allowed Claim which is in excess of the value of any collateral which is security for the repayment of the Claim, calculated in accordance with the provisions of Section 506 of the Bankruptcy Code.  Unless the Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed Deficiency Claim is treated hereunder as a Class 3 Allowed General Unsecured Claim.

8.    "Allowed General Unsecured Claim" means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Rejection Claim.

9.      "Allowed Priority Tax Claim" means an Allowed Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

10.     "Allowed Priority Unsecured Claim" means an unsecured Allowed Claim entitled to priority under Sections 507 of the Bankruptcy Code.

11.     "Allowed Section 503(b)(9) Administrative Claims" means an Allowed Claim entitled to administrative priority pursuant to Section 503(b)(9) of the Bankruptcy Code.

12.     "Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

13.     "Avoidance Action" means any action or proceeding filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid a Lien or transfer.

14.     "Bankruptcy Code" means Title 11, United States Code, as amended.  All citations in the Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly stated herein.

15.     "Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California, Santa Ana Division, which has jurisdiction over the Case and the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11 of the Bankruptcy Code and all applicable statutes, rules and regulations pertaining thereto.

16.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure, as amended, and the Local Bankruptcy Rules for use in the United States Bankruptcy Court for the Central District of California, as amended.

17.     "Bar Date" means the last date for creditors whose claims are not scheduled, or are scheduled as disputed, contingent, or unliquidated in the Debtor's Schedules to file Proofs of Claim, except for the following Claims: (i) Administrative Claims other than Section 503(b)(9) Administrative Claims, and (ii) Rejection Claims. The Bar Date was February 28, 2011.

18.     "Bid Procedures" means the procedures approved by a Final Order of the Bankruptcy Court with respect to the sale transaction regarding the Real Property Assets.

19.     "Budget" means an annual operating budget of the Reorganized Debtor which shall be approved by the Independent Board.

20.     "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

21.     "Case" means the Chapter 11 case commenced by the Debtor on the Petition Date and pending before the Bankruptcy Court, as Case No. 8:10-bk-24771 RK.

22.     "Cash" means cash and cash equivalents including, but not limited to, checks or similar forms of payment or exchange.

23.     "Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

24.     "Claims Objection Deadline" means, the latest of the following: (i) the two hundred and fortieth (240th) day after the Effective Date; (ii) with respect to a specific Claim, the one hundredth (100th) day after a Proof of Claim with respect to such Claim is filed by a Creditor, or (iii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Debtor or Reorganized Debtor and the Creditor.

25.     "Class" means the group of Claims classified in Article IV of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

26.     "Committee" means the duly appointed and acting Official Committee of Creditors Holding Unsecured Claims in the Case.

27.     "Condominium" means that certain residential real property located at 31423 Coast Highway, #33, Laguna Beach, California.

28.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

29.     "Confirmation Hearing" means the hearing(s) scheduled by the Bankruptcy Court for the purpose of considering the confirmation of the Plan.

30.     "Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

31.     "Creditor" means the holder of an Allowed Claim or Allowed Administrative Claim.

32.     "Creditor Board Member" means a designee of the Committee who serves as a member of the Independent Board pursuant to the Plan.

33.     "Crystal Cathedral Campus" means that improved commercial real properties located at located at 12051 Lewis Street, 12141 Lewis Street, 13280 Chapman Avenue and 13350 Chapman Avenue in the City of Garden Grove, California.

34.     "Cure Claim" means the amount necessary to cure the defaults under any of the executory contracts and unexpired leases assumed under the Plan.

35.     "Cure Claims Schedule" means the schedule of the Cure Claims, which shall be filed with the Bankruptcy Court, and served on the Committee, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

36.     "Debtor" means Crystal Cathedral Ministries.  For the purpose of this Disclosure Statement, reference to "Debtor" shall include the Reorganized Debtor.

37.     "Disclosure Statement" means the Debtor's Disclosure Statement, as the same may be amended or modified from time to time.

38.     "Disputed Claim" means all or any part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the

1  Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the

2  Claim is the subject of a timely objection or request for estimation which is filed on or before the

3  Claims Objection Deadline, which objection or request for estimation has not been withdrawn or

4  determined by a Final Order.  In addition, prior to the earlier of (a) the Claims Objection Deadline,

5  and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim

6  that is evidenced by a Proof of Claim shall be deemed a Disputed Claim for purposes of

7  calculating and making any Distributions under the Plan if: (1) no Claim corresponding to the

8  Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is

9  listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the

10  Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in

11  the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the

12  priority or classification of the Claim as specified in the Proof of Claim differs from the priority of

13  any corresponding Claim listed in the Schedules.

14      39.    "Disputed Claims Reserve" means a segregated, interest-bearing trust

15  account for the benefit of General Unsecured Creditors, established at a financial institution that is

16  an authorized depository under United States Trustee guidelines, into which the Distribution Agent

17  will deposit the Distributions required by Section XIII hereof.

18      40.    "Distribution" means the Cash that is required to be distributed under the

19  Plan to the holders of Allowed Claims.

20      41.    "Distribution Agent" means the Reorganized Debtor or its designee.

21      42.    "Effective Date" means a date selected by the Debtor, but in no event later

22  than the one hundred and twentieth (120th) calendar day after the Confirmation Date.

23      43.    "Estate" means the Debtor's bankruptcy estate created under Section 541 of

24  the Bankruptcy Code in the Case.

25      44.    "Estate Claims" means any and all claims and causes of action that

26  constitute property of the Estate including, but not limited to, any Avoidance Actions and any

27  causes of action or claims for recovery of any amounts owing to the Debtor or the Estate.

28      45.    "F&M" means Farmers & Merchants Bank of Long Beach.

-12-

46.    "Final Order" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which a Debtor, a Reorganized Debtor, or the Committee is a party, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

47.    "First Payment Date" means the first Business Day of the first full month following the Effective Date.

48.    "General Administrative Claims Bar Date" means the date by which all requests for payment of Administrative Claims, with the exception of Administrative Tax Claims and Section 503(b)(9) Administrative Claims, shall be filed with the Bankruptcy Court and served upon the Reorganized Debtor, which date shall be no later than sixty (60) days after the Effective Date.

49.    "General Unsecured Claim" means an unsecured Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Rejection Claim.

50.    "General Unsecured Creditor" means the holder of an Allowed General Unsecured Claim.

51.    "Governmental Unit" shall have the meaning provided in Section 101(27) of the Bankruptcy Code.

52.    "Initial Distribution Date" means the date on which the first Distribution is made to a Class.

53.    "Insiders" means the following individuals: Robert H. Schuller; Arvella Schuller; Sheila Schuller Coleman; Jim Coleman; Jeanne Dunn; Paul Dunn; Carol Milner; Tim Milner; Gretchen Penner; James Penner; Paige Penner; Neva Penner-Klaassen; Nick Klaassen; Diane Penner-Kirchner; Ashley Dennison-Kirchner; Courtney Dennison-Kirchner; Robert A. Schuller; and Donna Schuller.

1           54.     "Lien" means any lien, encumbrance, pledge or other charge against

2  property.

3           55.     "Net Proceeds" means the proceeds generated from the pursuit of Estate

4  Claims, net of all attorneys' fees and other costs necessary to recover such proceeds.

5           56.     "Net Sales Proceeds." The Cash generated from the sale(s) or liquidation of

6  the Debtor's assets valued in excess of $1,000.00, less payment of selling expenses, closing costs,

7  taxes, association dues, and any associated Post-Confirmation Expenses pursuant to the Plan

8  Financial Projections and Administrative Claims incurred in furtherance of such sales or

9  liquidation of such assets.

10         57.     "Net Sales Proceeds Account." The Debtor shall establish a separate

11  account at an FDIC insured bank into which all Net Sale Proceeds shall be deposited from the sale

12  of any of its assets valued in excess of $1,000.00.

13         58.     "Objection Value" means the highest fair market value of property asserted

14  by a Creditor in opposition to the Debtor's asserted value in the Plan of a property securing such

15  Creditor's Claim.

16         59.     "Paid in Full" means the Debtor's payment obligations to a particular Class

17  of Creditor under the Plan have been fully satisfied.

18         60.     "Personal Property Assets" means certain personal property including a coin

19  collection, and artwork.

20         61.     "Petition Date" means the date on the Debtor filed its petition for relief

21  under Chapter 11 of the Bankruptcy Code (October 18, 2010).

22         62.     "Plan" means the Debtor's Chapter 11 Plan of Reorganization, together with

23  the exhibits thereto, as the same may be amended or modified from time to time.

24         63.     "Plan Financial Projections" means the financial projections prepared by the

25  management of the Debtor, with assistance from the Debtor's Financial Advisor and Consultant.

26         64.     "Post-Confirmation Expenses" means the fees and expenses incurred by the

27  Debtor and its professionals following the Confirmation Date (including the fees and costs of

28  Professionals) for the purpose of (i) prosecuting and liquidating the Avoidance Actions;

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

(ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Debtor's Chapter 11 Case.

65.   "Priority Tax Claim" means any Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

66.   "Priority Tax Holder" means a holder of an Allowed Priority Tax Claim.

67.   "Priority Unsecured Claim" means any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507 of the Bankruptcy Code.

68.   "Professional" means a person or entity employed by the Debtor or by the Committee pursuant to a Final Order in accordance with Sections 327 or 1103 of the Bankruptcy Code.

69.   "Proof of Claim" means a written statement filed in a Case by a Creditor in which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

70.   "Pro Rata" means proportionately, so that with respect to any Distribution in respect of any Allowed Claim, the ratio of (i) (a) the amount of property distributed or reserved on account of such Allowed Claim to (b) the amount of such Allowed Claim, is the same as the ratio of (ii) (a) the amount of property distributed or reserved on account of all Allowed Claims of the Class sharing in such Distribution to (b) the amount of all Allowed Claims in such Class.

71.   "Real Property Assets" means the Crystal Cathedral Campus and the Condominium.

72.   "Rejection Claim" means any Claim based upon, or arising from, the rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or pursuant to the Plan.

73.   "Reorganized Debtor" means the Debtor, as reorganized under the terms of the Plan on and after the Effective Date.

74.   "Reorganized Debtor's Certification" means a certification by a person with requisite authority on behalf of the Reorganized Debtor stating that, in its sole and absolute

-15-

1   discretion, the Reorganized Debtor has determined that all Allowed Claims have been duly paid

2   and that all Estate Claims and objections to Disputed Claims have been resolved by Final Order,

3   which certification shall be filed with the Bankruptcy Court and served upon the United States

4   Trustee.

5        75.    "Repayment Date" means the date that Allowed General Unsecured Claims

6   have been Paid in Full.

7        76.    "Repossession Option" means the Debtor's option pursuant to the Plan to

8   require a holder of an Allowed Secured Claim to repossess the property securing such Claim.

9        77.    "Sales Period" means the time period that the Debtor is provided under the

10  Plan to consummate a sale or liquidation of the Real Property Assets subject to the claims of

11  Secured Claimants. The Sales Period shall commence on the Confirmation Date and shall expire

12  sixty days (60) days after the Effective Date.

13       78.    "Schedules" means the Schedules of Assets and Liabilities and Statement of

14  Financial Affairs filed by the Debtor in the Case, as required by Section 521(1) of the Bankruptcy

15  Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official Bankruptcy Form No. 6,

16  as the Schedules may be amended from time to time.

17       79.    "Section 503(b)(9) Administrative Claims" means any Claim, to the extent

18  allowable pursuant to Section 503(b)(9) of the Bankruptcy Code and the Plan.

19       80.    "Secured Claim" means any Claim, including interest, reasonable attorneys'

20  fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the Bankruptcy Code

21  and the Plan, that is secured by a Lien on property in which a Debtor has an interest or that is

22  subject to recoupment or setoff under Section 553 of the Bankruptcy Code, to the extent of the

23  value of the interest of the holder of such Secured Claim in the Debtor's interest in the property,

24  determined pursuant to Section 506(a) of the Bankruptcy Code.

25       81.    "Secured Creditors" means, collectively all of the Creditors in Classes 1.1

26  through 1.9.

27       82.    "Tax" means any tax, charge, fee, levy, or other assessment by any federal,

28  state, local or foreign taxing authority, including, without limitation, income, excise, property,

sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated,

severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions

attributable to, or imposed on or with respect to, such assessments.

83.  "Tax Claims" means any Claim, pre-petition or post-petition, relating to a

Tax.

84.  "Unclaimed Property" means any Distribution of Cash or other property to a

Creditor that is returned to the Reorganized Debtor as undeliverable.

85.  "Unclaimed Property Reserve" means an interest-bearing segregated

account in which Unclaimed Property shall be set aside and held.

86.  "United States Trustee" means the Office of the United States Trustee.

**B.**    **Rules of Construction**. For the purpose of this Disclosure Statement, unless

otherwise provided in this Disclosure Statement, (i) whenever from the context it is appropriate,

each term, whether stated in the singular or the plural, shall include both the singular and the

plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine,

feminine and neuter; (iii) any reference in this Disclosure Statement to an existing document,

Exhibit or schedule filed or to be filed means such document or schedule as it may have been or

may be amended, modified or supplemented pursuant to this Disclosure Statement; (iv) any

reference to an entity as a holder of a Claim or Interest includes that entity's successors and

assigns; (v) except as otherwise stated herein, all references in this Disclosure Statement to

Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this

Disclosure Statement; (vi) the words "herein," "hereunder" and "hereto" refer to this Disclosure

Statement in its entirety rather than to a particular portion of this Disclosure Statement; (vii) unless

otherwise provided in this Disclosure Statement, any reference in this Disclosure Statement to a

contract, instrument, release, indenture, agreement, or other document being in a particular form or

on particular terms and conditions means that such document shall be substantially and materially

in such form or substantially and materially on such terms and conditions; and (viii) the rules of

construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1   are not inconsistent with the express terms of this Disclosure Statement or any other provision in

2   herein.

3         **C.**     **Exhibits**. All exhibits to this Disclosure Statement are incorporated into and are a

4   part of this Disclosure Statement as if set forth in full herein.

5                                               **III.**

6                           **CONFIRMATION AND VOTING**

7         A Creditor may vote to accept or reject the Plan by filling out and sending to the Debtor's

8   counsel the form of the ballot which has been provided herewith. Ballots may be sent by: mail

9   Winthrop Couchot, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660 (Attn:

10   Ms. P. J. Marksbury); facsimile (949) 720-4111; or email pj@winthropcouchot.com.

11         In order to vote for or against the Plan, a Creditor must have filed a Proof of Claim on or

12   before the Bar Date, unless its Claim is listed in the Schedules filed in the Debtor's Case as not

13   being disputed, unliquidated, contingent or unknown. Any such Creditor is, to the extent listed in

14   the Schedules, deemed to have filed a Claim, and, absent a timely objection to the Claim, such

15   Claim is deemed allowed. In order to determine whether a Creditor is entitled to vote on the Plan

16   notwithstanding any failure to timely file a Proof of Claim, the Creditor should review the

17   Debtor's Schedules on file with the Bankruptcy Court. If the Creditor's Claim is not scheduled, or

18   if it is scheduled as contingent, disputed, unliquidated or unknown and the Creditor did not file a

19   Proof of Claim prior to the Bar Date, the Creditor may not be entitled to vote on the Plan.

20         The Bankruptcy Court has fixed          , 2011 as the last date by which ballots must

21   be received by the Debtor's counsel. Subject to review and determination by the Bankruptcy

22   Court, votes received by the Debtor after that date may not be counted. Regardless of whether a

23   Creditor votes on the Plan, it will be bound by the terms and treatment set forth in the Plan if the

24   Plan is confirmed by the Bankruptcy Court. Absent some affirmative act constituting a vote, such

25   Creditor will not be included in the voting tally. Allowance of a Claim for voting purposes, or

26   disallowance of any Claim for voting purposes, does not necessarily mean that all or a portion of

27   the Claim will be allowed or disallowed for distribution purposes.

28

The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are satisfied.  Section 1129 requires, inter alia, that:  (a) with respect to each Class of Claims, each Creditor in that Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value that is not less than the amount such Creditor would receive if the Debtor was to liquidate its assets under Chapter 7 of the Bankruptcy Code; (b) confirmation of the Plan is not likely to be followed by a liquidation of the Debtor or the need for further reorganization of the Debtor; and (c) the Plan be accepted by each Class of Claims that is impaired by the Plan, and/or the Plan does not discriminate unfairly and is fair and equitable to any impaired Class that has not accepted the Plan.

To confirm the Plan, the Bankruptcy Court must determine whether the Plan has been accepted by each "impaired" Class entitled to vote on the Plan.  Pursuant to Section 1124 of the Bankruptcy Code, Classes "impaired" by the Plan are those Classes whose legal, equitable or contractual rights are altered pursuant to the Plan.  Under Section 1126(c) of the Bankruptcy Code, an impaired Class of Claims is deemed to have accepted the Plan if the Plan is accepted by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan.

Only the votes of those Creditors whose ballots are timely received may be counted in determining whether a Class has accepted the Plan.  Creditors are, therefore, urged to fill in, date, sign and promptly mail the enclosed ballot.  Each Creditor must properly complete the ballot and legibly identify its name on the ballot.

Any Creditor holding Claims in more than one impaired Class must file one ballot for each such Class.  If a Creditor has received an incorrect ballot, or believes that it is entitled to vote in more than one Class, additional ballots may be obtained upon written request to Winthrop Couchot (Attn:  Ms. P.J. Marksbury) by mail, facsimile (949) 721-4111; or email (pj@winthropcouchot.com).

In the event that one impaired class but not all impaired Classes accept the Plan, the Debtor intends to request that the Bankruptcy Court confirm the Plan pursuant to the provisions of

1  Section 1129(b) of the Bankruptcy Code.  Pursuant to Section 1129(b), the Plan may be confirmed

2  despite the failure of a Class of Claims to accept the Plan if the Bankruptcy Court determines that

3  the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of

4  Claims that is impaired under, and has not accepted, the Plan.  The condition that the Plan be fair

5  and equitable with respect to such nonaccepting Classes includes certain legal requirements as

6  more fully set forth in Section 1129(b).

7  IV.

8  **BACKGROUND OF THE DEBTOR**

9       **A.**    **The Debtor.**    The Reverend Dr. Robert H. Schuller and his wife, Arvella,

10  founded the Debtor in 1955.  At that time, it consisted of a single church, known as Garden Grove

11  Community Church, which held its services in space rented from the Orange Drive-In Theatre.

12  The church moved to its current location in Garden Grove, California in 1961, ultimately

13  occupying a new sanctuary called the Crystal Cathedral designed by architect Philip Johnson.

14       The Debtor produces The Hour of Power, which is shown throughout the world and is

15  North America's longest running televised church service.  The Debtor's message of "possibility

16  thinking" is also supported through its many facets, including, *inter alia*: (1) the delivery of

17  messages of hope each Sunday by Pastors Sheila Schuller Coleman and Dante Gebel.  Dr.

18  Schuller, who is 84, is the featured speaker once per month; (2) providing meals for the homeless

19  every Monday; (3) conducting weekly youth groups; and (4) hosting a number of weekly self-

20  help programs.  The Debtor also operates a K-12 school and cemetery on the Crystal Cathedral

21  Campus.

22       **B.**    **Financial Performance of the Debtor.**  The following is a summary of the

23  Debtor's pre-petition financial performance:

|  | 2008 | 2009 | 2010 (YTD to and Including October 17, 2010) |
|---|---|---|---|
| Gross Revenue | $54,582,004 | $41,207,319 | $22,284,516 |

27       **C.**    **Pre-Petition Legal Proceedings.**  Prior to the Petition Date, the following

28  proceedings were instituted against the Debtor.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

| Caption of Suit and Case Number | Nature of Proceedings | Court or Agency and Location | Status or Disposition |
|---|---|---|---|
| Interinsurance Exchange of the Auto Club v. Crystal Cathedral Ministries | Civil Action | State Court - Westminster, California | Pending |
| Citicaster v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Gray Television v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Hearst Television v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| IVB Media Services, Inc. v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| KWGN, Inc. v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Lin Television v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| PNCEF, LLC, an Indiana Limited Liability Company v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Fernando Ruballos dba MSE Media Solutions v. Mascom Advertising/Crystal Cathedral Ministries Corporation/Crystal Cathedral Corporation | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Tribune Comp. dba Los Angeles Times v. Crystal Cathedral Ministries | Civil Action | Orange County Superior Court, Santa Ana | Pending |
| Patrick J. Couchois vs. Crystal Cathedral Ministries | Civil Action | District Court, Central District of California | Pending |

## V.

## THE DEBTOR'S CHAPTER 11 PROCEEDING

**A.**      **Events Precipitating the Debtor's Chapter 11 Filing.** Over the last few years, the Debtor's leadership has gone through two major changes as the ministry has endeavored to transition from its founders to the next generation who will carry the mission of the ministry

-21-

1   forward.  Robert A. Schuller became Senior Pastor in 2006.  He ultimately resigned and Dr. Sheila

2   Schuller Coleman became the Senior Pastor in July of 2009.  The period of unsettled leadership

3   caused some in the congregation and viewing audience to leave the ministry, resulting in reduced

4   revenue for an organization that exists primarily on donations. However, the greatest impact on

5   the Debtor's revenues came from the severe downturn in the national economy, which has had a

6   drastic impact on donations to the Debtor and to charitable giving in general. Donations were

7   down approximately 24% in 2009 alone.

8        Since Dr. Coleman has taken over as Senior Pastor, she has focused her efforts on restoring

9   confidence and enthusiasm in the ministry.  Even though the Debtor cut expenses, the decline in

10  donations and other revenue was so severe that the benefits of these reductions could not be

11  recognized quickly enough and the Debtor's level of debt, both secured and unsecured, increased.

12  In particular, the Debtor founds itself unable to make payments to a number of their broadcast

13  stations and vendors who supplied goods and services in connection with the 2009 Glory of

14  Christmas.  Ultimately, the Debtor decided to address the growing amount of debt by convening a

15  general meeting of creditors under the auspices of Credit Managers Association of California. The

16  meeting was well attended and resulted in a voluntary 90-day moratorium on debt collection

17  activities, which was almost universally observed. Due to the need to have reliable financial

18  information on which to base an out of court repayment plan, the Unofficial Creditors Committee

19  ("Unofficial Committee") granted the Debtor a conditional 90 day extension of the moratorium.

20  Negotiations were well underway between the Debtor and Unofficial Committee when certain

21  creditors sought and obtained writs of attachment and a number of other lawsuits were filed

22  against the Debtor.  Unfortunately, the negotiations between the Debtor and the Unofficial

23  Committee stalled due to concern over the cash flow projections and financial reports.  Given

24  these circumstances, the Unofficial Committee decided to allow the moratorium to expire on

25  October 9, 2010 and thereafter, made a demand for payment. Cumulatively, these circumstances

26  then forced the Debtor to file the present Chapter 11 proceeding the Petition Date in order to

27  obtain a breathing spell within which to address the claims of all creditors on a fair, equitable and

28  uniform basis.

1    **B.**    **Debtor-in-Possession Status.** Since the Petition Date, the Debtor has continued to

2    operate as a "debtor-in-possession" subject to the supervision of the Bankruptcy Court and in

3    accordance with the Bankruptcy Code. The Debtor is authorized to operate its ministry in the

4    ordinary course. However, all transactions outside of the ordinary course of business must be

5    approved by the Bankruptcy Court.

6    **C.**    **The Automatic Stay.** Upon the filing of the Case, an automatic stay was imposed

7    in the Case pursuant to Section 362 of the Bankruptcy Code. Subject to certain statutorily

8    defined exceptions, the stay enjoins the commencement or continuation of all collection efforts

9    by Creditors, the enforcement of Liens against property of the Debtor, and the continuation of

10   litigation against the Debtor. The automatic stay will remain in effect in this Case until the

11   earliest of the entry of an order of the Bankruptcy Court lifting or modifying the stay, the

12   Effective Date of the Plan, or the closing of the Case.

13   **D.**    **Significant Events Which Have Occurred Since the Petition Date.**

14         1.    First Day Motions. On the Petition Date, the Debtor filed several motions

15   seeking what is commonly referred to as "first day orders." The relief granted in the first day

16   orders is designed to enable a debtor to transition into Chapter 11 without any material disruption

17   to its business operations. These orders generally grant relief that falls outside the ordinary course

18   of business, or otherwise requires a bankruptcy court order. The first day orders for the motions

19   listed below were entered by the Bankruptcy Court on or about October 20, 2010.

20         b.    Emergency Motion for Order Authorizing Use of Any Cash

21   Collateral of Secured Claimants.

22         c.    Emergency Motion for Order Authorizing Payment and Honoring of

23   Prepetition Payroll Obligations;

24         d.    Emergency Motion for Order: (A) Prohibiting Utility Providers from

25   Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of

26   Future Performance, and (C) Establishing Procedures for Determining Adequate Assurances

27   of Payment under Section 366 of the Bankruptcy Code.

28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

e.       Motion to Limit Notice of Certain Matters Requiring Notice to

Creditors Pursuant to Rules 2002 and 9007 of the Federal Rules of Bankruptcy Procedure.

2.       Other Motions.

a.       Debtor's Motion for Use of Any Cash Collateral of Secured

Claimants. Following the Bankruptcy Court's interim approval of the Debtor's use of cash

collateral, a final hearing regarding the Debtor's cash collateral use was scheduled by the

Bankruptcy Court for November 5, 2010.       The Debtor filed a notice of partial withdrawal

of Debtor's cash collateral motion as to F&M. The Committee subsequently filed a notice

of non-opposition to the Debtor's motion for use of cash collateral and reservation of rights.

On November 24, 2010, this Court granted the Debtor's motion to use cash collateral on a

final basis. It is anticipated that the Debtor will continue to use cash collateral, by

agreement with the Committee, through the date of the Confirmation Hearing.

b.       Motion to Extend Time to Assume or Reject Leases. On

February 17, 2011, the Debtor filed a motion to extend the period within which the Debtor

may assume or reject unexpired leases ("Motion to Extend"). On February 17, 2011, this

Court entered an order granting the Motion to Extend and extending the time within which

the Debtor may assume or reject unexpired leases to and including May 16, 2011. On April

21, 2011, the Debtor filed a motion to assume a certain non-residential real property lease,

which was granted. To date, an order on the motion to assume has not been entered.

c.       Applications to Employ Professionals. The Debtor and the

Committee filed applications to employ the following professionals:

| Winthrop Couchot | Debtor's General Insolvency Counsel |
| Palmieri, Tyler, Wiener & Waldron | Debtor's Special Corporate Counsel |
| Lutzker & Lutzker, LLP | Debtor's Special IP Counsel |
| Singer Lewak, LLP | Debtor's Accountant |
| Ringstad & Sanders, LLP | Committee's Counsel |
| BWS & Associates | Committee's Financial Consultant |

The Debtor will be filing an application to employ FTI Consulting, Inc. as its

financial advisor and consultant in the near future.

-24-

d.      **Motion to Extend Exclusivity Periods.**  The Debtor filed a motion for

Order for First Extension of Exclusive Periods to File a Plan and Solicit Acceptances

Thereof.  The Debtor subsequently entered into a stipulation with the Committee pursuant

to which the parties agreed that the Debtor's exclusivity periods would be extended for 60

days (April 17, 2011 and June 17, 2011, respectively).  The Debtor filed a motion for order

further extending the Debtor's plan exclusivity periods under Local Bankruptcy

Rule 9013-1.  The Committee filed an objection and accordingly, the Debtor set the matter

for hearing on June 1, 2011.

e.      **Motion Authorizing Rejection of Certain Executory Contracts; and**

**Contract Rejection Procedures.**  The Debtor filed a motion to reject certain executory

contracts that it deemed to be burdensome and unnecessary for its continued operations and

for the establishment of contract rejection procedures under Local Bankruptcy Rule 9013-1.

The Debtor did not receive an opposition and accordingly, it filed a notice of non-opposition

and order.  To date, an order has not been entered.

f.      **Motion to Approve Stipulation for Adequate Protection Payments to**

**Farmers & Merchants Bank of Long Beach and Limited Relief from the Automatic Stay.**

The Debtor filed a motion seeking approval of a stipulation with F&M for payment of

adequate protection payments and limited relief from the automatic stay.  On April 1, 2011,

this Court entered an order granting that motion.

g.      **Motion to Approve Stipulation for Limited Modification of the**

**Automatic Stay.**  The Debtor filed a motion seeking approval of a stipulation with Patrick J.

Couchois for limited modification of the automatic stay to allow Mr. Couchois to continue

to prosecute a certain state court action against the Debtor as a nominal defendant in

exchange for a waiver of any claim against the estate.  On April 1, 2011, this Court entered

an order granting that motion.

**E.      Actual and Projected Recovery of Preferential or Fraudulent Transfers.**  The

Debtor is in the process of analyzing its books and records to determine whether any payments

made prior to the Petition Date constitute preferential transfers avoidable pursuant to Section 547

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1  of the Bankruptcy Code, or whether any transfers made by the Debtor are avoidable as fraudulent

2  transfers under Sections 544(b) or 548 of the Bankruptcy Code.

3       **F.**    **Sale of Assets and Bid Procedures.**  The Plan contemplates (among other things)

4  the sale of the Debtor's real estate assets.  The Debtor, in its sole discretion, reserves the right to

5  seek court approval for a sale of some or all of its assets pursuant to Section 363 prior to

6  Confirmation should it be requested to do so by a potential buyer or the Committee.  Regardless,

7  the Debtor will seek, either at the hearing regarding approval of this Disclosure Statement or at a

8  separate hearing prior thereto, an order establishing bid procedures for the conduct of the sale of

9  the Real Estate Assets.

10       **G.**    **Projected Objections to Claims Filed Against the Estate.**  The Bar Date was

11  established as February 28, 2011.  The Debtor is in the process of analyzing the claims registry.

12  The Debtor reserves any and all rights to object to Claims both before and after confirmation of

13  the Plan.  Claimants whose Claims are objected to will receive notice and an opportunity to

14  respond.  Any objections to Claims shall be filed on or before 240 days after the Effective Date of

15  the Plan.  Unless a creditor's Claim has been expressly allowed by Order of the Bankruptcy Court,

16  and except as noted above, no creditor should rely or expect that his/her Claim will be allowed in

17  full when voting on the Plan.  Anticipated Claim objections include, *but are not limited to*:

18           1.    Claims which are for amounts greater than the value provided or justified in

19  the Debtor's estimation.

20           2.    Duplicate Claims.

21           3.    Claims which have been paid in full.

22           4.    Claims lacking adequate documentation or support.

23           5.    Untimely Claims.

24           6.    Claims which are not supported by the Debtor's books and records, or in

25  excess thereof.

26           7.    Claims which are unenforceable against the Debtor and/or property of the

27  Estate, under any agreement or applicable law.

28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1           8.     Claims for improper or unreasonable interest, attorneys' fees, charges, costs,

2 etc.

3           9.     Claims for interest that are unmatured as of the Petition Date.

4          10.    Claims of any entity from which property is recoverable under section 542,

5 543, 550, or 553 or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544,

6 545, 547, 548, 549, or 724(a), unless such entity or transferee has paid the amount, or turned over

7 any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550,

8 or 553.

9          11.    Any Claim relating to a lease, which is a disguised security agreement.

10          12.    Claims which are contingent claims for reimbursement, indemnity or

11 contribution, or any entity that asserts a right of subrogation to the rights of such creditor.

12          13.    Claims which may be subordinated under Bankruptcy Code sections 509

13 or 510.

14     The foregoing list is not intended to be exhaustive of all potential claim objections.  Rather,

15 the Debtor seeks to place all creditors on notice that the Debtor reserves all rights to bring claim

16 objections (except as noted above) on any and all grounds.

17 **VI.**

18 **FINANCIAL INFORMATION REGARDING THE DEBTOR**

19     **A.**    **Historical Financial Information.**  Attached hereto as Exhibit "1" is a copy of the

20 Debtor's unaudited consolidated financial statements for the fiscal years 2006-2009.

21     **B.**    **Financial Information Provided During the Case.**  The Debtor has filed its

22 Schedules in the Case.  The Schedules provide substantial financial information regarding the

23 assets and liabilities of the Estate as of the Petition Date.  The Schedules are available for

24 inspection, during normal business hours, at the Clerk's Office of the Bankruptcy Court, located at

25 411 West Fourth Street, Santa Ana, California 92701.

26     In addition to the Schedules, the Debtor has prepared throughout the Case interim

27 statements and operating reports in accordance with the requirements of the United States Trustee.

28 Copies of the interim statements and operating reports are available for inspection, during normal

1  business hours, at the United States Trustee, located at 411 West Fourth Street, Suite 9041, Santa

2  Ana, California 92701.

3       The Debtor has attached copies of its profit and loss statement and balance sheet for the

4  month ending April 2011 and all cumulative post-petition periods, collectively, as Exhibit "2."

5       AS TO THE UNCERTIFIED AND UNAUDITED FINANCIAL INFORMATION

6  CONTAINED IN, OR ATTACHED TO, THIS DISCLOSURE STATEMENT, THE DEBTOR IS

7  UNABLE TO WARRANT OR REPRESENT THAT THE FINANCIAL INFORMATION IS

8  WITHOUT ANY INACCURACIES, ALTHOUGH THE DEBTOR BELIEVES THAT IT HAS

9  MADE REASONABLE EFFORTS, UNDER THE CIRCUMSTANCES, TO PRESENT FAIRLY

10  AND ACCURATELY SUCH FINANCIAL INFORMATION.

11       **C.**    **Financial Performance During the Case.**  During the Case, the Debtor, as debtor-

12  in-possession, has been responsible for the management of the Debtor's ministry and the

13  administration and management of assets of the Estate.  The Debtor has paid all accruing post-

14  petition expenses associated with the operation of the Debtor's ministry with the exception of

15  certain accrued fees and costs of Professionals, which fees and costs have not been timely paid

16  throughout the Debtor's Case, but which will be paid current on the Effective Date.  The Debtor

17  has properly maintained and preserved assets of the Estate.

18  **VII.**

19  **DESCRIPTION OF THE PLAN OF REORGANIZATION**

20       The following is a brief summary of the Plan and is qualified in its entirety by the full text

21  of the Plan.  The terms of the Plan will be controlling on the Creditors in the event that the Plan is

22  confirmed.  Therefore, all Creditors are urged to read the Plan carefully in its entirety rather than

23  relying on this summary.

24       **A.**    **Basic Structure of the Plan.**  The Plan proposes to pay the Claims of the Classes

25  of Creditors in accordance with the provisions of the Plan.  Classes 1.5 – 1.8, Class 3 and Class 4

26  are "impaired" under the Plan, as that term is defined by Section 1124 of the Bankruptcy Code.

27       **B.**    **Classification and Treatment of Claims.**  Section 1123 of the Bankruptcy Code

28  requires that the Debtor, with certain exceptions, classify separately in the Plan all Claims.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1  Pursuant to Section 1122 of the Bankruptcy Code, the Debtor may place all Claims that are

2  substantially the same in the same Class in the Plan.  Section 1123(a)(4) of the Bankruptcy Code

3  requires that the Plan provide the same treatment for all Claims in the same Class, unless the

4  holder of a particular Claim agrees to a less favorable treatment of its Claim.  The treatment of

5  each Class of Claims is set forth in Articles IX below.

6  **VIII.**

7  **UNCLASSIFIED CLAIMS**

8  As required by the Bankruptcy Code, the Plan places Claims into various Classes according

9  to their right to priority.  However, in accordance with the provisions of Section 1123(a)(1) of the

10  Bankruptcy Code, Administrative Claims, Section 503(b)(9) Administrative Claims, and Priority

11  Tax Claims are deemed "unclassified."  These Claims are not considered impaired, and they do not

12  vote on the Plan, because they are automatically entitled to specific treatment provided for them in

13  the Bankruptcy Code.  As such, the Debtor has not placed these Claims in a Class.  The treatment

14  of these unclassified Claims is as provided below.

15  **A.    Administrative Claims**.  Administrative Claims are Claims for the expenses of

16  administering a Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well

17  as Claims for goods received by the Debtor in the ordinary course of business within 20 days of

18  the order for relief.  The Bankruptcy Code requires that all administrative claims be paid on the

19  effective date of a Chapter 11 plan, unless a particular creditor agrees to a different treatment of its

20  claim.  The treatment of Administrative Claims and Section 503(b)(9) Administrative Claims in

21  the Plan is as described below.

22  1.    Payment Generally.  Except to the extent that the holder of an Allowed

23  Administrative Claim agrees to a different treatment of its Administrative Claim, and subject to

24  the bar dates for Section 503(b)(9) Administrative Claims and all other Administrative Claims,

25  each Allowed Administrative Claim shall be Paid in Full, in Cash, on the latest of (i) the Effective

26  Date, (ii) the tenth (10th) Business Day after the date upon which such Administrative Claim

27  becomes an Allowed Administrative Claim, or (iii) the date upon which such Allowed

28  Administrative Claim becomes due according to its terms.

2.    Subordination of Insiders' Claims.  The Claims of Insiders[2], including, but not limited to, Administrative Claims, that Insiders, individually or collectively, have or may have against the Estate will be subordinated until all Allowed General Unsecured Claims are Paid in Full.

3.    Administrative Claims Bar Date.  Any holder of an Administrative Claim that does not file and properly serve such a request for payment by the General Administrative Claims Bar Date and the Bar Date for Section 503(b)(9) Claims, as the case may be, shall be forever barred from asserting such Administrative Claim against the Debtor, the Reorganized Debtor, its Estate, or any of its property, or the Committee.  Notwithstanding anything to the contrary contained in the foregoing, (i) any Governmental Unit may assert an Administrative Tax Claim or other post-petition Tax Claim pursuant to the statutory requirements applicable thereto without regard to the General Administrative Claims Bar Date; and (ii) holders of accrued post-petition *ad valorem* Tax Claims against property owned by the Reorganized Debtor shall retain any Liens that they may have pursuant to applicable law on account of such Tax Claims, and holders of such Tax Claims shall be paid the amount of their Tax Claims in the ordinary course of the Reorganized Debtor's ministry without the requirement that a Proof of Claim or request for payment of such Tax Claim be filed with the Bankruptcy Court.

4.    Projected Administrative Claims.  The following chart is an estimate of all of the Debtor's projected and unpaid Administrative Claims.[3]

| Name | Amount Owed |
|---|---|
| Clerk's Office Fees | $0.00 (est.) |
| Office of the U. S. Trustee Fees | $0.00 (est.) |
| Orange County Treasurer Tax and Collector | 59,002.00 (est.) |
| Winthrop Couchot P.C. (Debtor's General Insolvency Counsel) | $0.00 (est.) |
| Palmieri, Tyler, Wiener & Waldron, LLP (Debtor's Special Corporate Counsel) | $32,709.00 (est.) |

---

[2] The Insiders' Claims include: Robert A. Schuller: Claim No. 221 – $1,400,000.00; Jeanne Dunn: Claim No. 229 - $25,908.80; Paul Dunn: Claim No. 230 -$52,037.57; Timothy Milner: Claim No. 241 - $98,313.00; Arvella Schuller: Claim No. 242 - not stated; Carol Milner: Claim No. 243 - $10,615; 246; Robert Harold, Inc. and Dr. Robert H. Schuler: Claim No. 245 – unknown; Robert Harold, Inc.: Claim No. 246 - $223,078.09.

[3] Based on its preliminary review of the Schedules and Claims Register, the Debtor does not believe that there are any Section 503(b)(9) Claims.

-30-

| Name | Amount Owed |
|------|-------------|
| Lutzker & Lutzker, LLP (Debtor's Special IP Counsel) | $6,901.00 (est.) |
| Singer -- Lewak, LLP (Debtor's Accountant) | $0.00 (est.) |
| FTI Consulting, Inc. (Debtor's Financial Advisor and Consultant) | $74,538.00 (est.) |
| Ringstad & Sanders, LLP (Committee's Counsel) | $0.00 (est.) |
| BSW & Associates (Committee's Financial Consultant) | $26,849.00 (est.) |
| Cure Claims | $125,658.00 |
| **TOTAL** | $325,658.00 (est.)[4] |

**B.    Priority Tax Claims.** Unless the holder of an Allowed Priority Tax Claim agrees to a different treatment thereof, each holder of an Allowed Priority Tax Claim shall receive under the Plan deferred cash payments, of a value, as of the Effective Date, equal to its Allowed Claim. Such deferred cash payments, including principal and interest, shall be paid on a quarterly basis, and shall be in an amount sufficient to fully amortize each Allowed Priority Tax Claim over a period not to exceed five (5) years from the Effective Date. The outstanding and unpaid amount of each Allowed Priority Tax Claim shall bear interest accruing at the rate specified by Section 6621 (a) of the Internal Revenue Code on the Effective Date, commencing on the Effective Date and continuing until such Allowed Priority Tax Claim is paid in full. Payment of any Allowed Priority Tax Claim shall commence on the latter of (a) the fifteenth (15th) day of the first full month following the Effective Date, or (b) the tenth (10th) Business Day after the entry of a Final Order allowing the Priority Tax Claim. Such payments shall continue quarterly on the fifteenth day of each full month every three (3) months thereafter until Paid in Full. Creditors holding Allowed Priority Tax Claims may be prepaid at any time without any penalty or other charges.

**C.    Amount of Priority Tax Claims.** The following chart is an estimate of all of the Debtor's Priority Tax Claims.

| Creditor | Claim |
|----------|-------|
| Internal Revenue Service (Claim  No. 20) | $189,200.00 |

[4] The majority of the professionals have obtained payment of a substantial amount of their post-petition fees and costs on a monthly basis during the Case. The Debtor's estimate of fees owed to the Professionals as of the Effective Date assumes that the Debtor will continue to make monthly payments to Professionals through the Effective Date, and accounts for any pre-petition retainers paid by the Debtor.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

| | |
|---|---|
| Employment Development Department | $6,743.95 |
| State Board of Equalization (Claim No. 71) | $1,198.00 |
| Total | $197,141.95 |

## IX.

## CLASSIFICATION OF CLAIMS

**A.**   **General Overview.** As required by the Bankruptcy Code, the Plan places Claims

into various Classes according to their right to priority and other relative rights. The table in

Paragraph IX(B) below lists each Class of Claims established under the Plan and states whether

each Class is impaired or is unimpaired by the Plan. A Class is "unimpaired" if the Plan leaves

unaltered the legal, equitable and contractual rights to which the holders of Claims in the Class are

entitled, with certain exceptions specified in the Bankruptcy Code. The Plan sets forth the

treatment that each Class will receive under the Plan.

**B.**   **Designation of Classes.** The Plan provides for the establishment of the following

Classes of Claims.

| Class | Creditors | Impaired or Unimpaired |
|---|---|---|
| Class 1.1 Claim | Allowed Secured Claim of Los Angeles County Treasurer and Tax Collector | Unimpaired |
| Class 1.2 Claim | Allowed Secured Claim of F&M | Unimpaired |
| Class 1.3 Claim | Allowed Secured Claim of Grant & BCG, LLC | Unimpaired |
| Class 1.4 Claim | Allowed Secured Claim of GE Capital Public Finance, Inc. | Unimpaired |
| Class 1.5 Claim | Allowed Secured Claim of Canon Financial Services | Impaired |
| Class 1.6 Claim | Allowed Secured Claim of PNC Equipment Finance, LLC | Impaired |
| Class 1.7 Claim | Allowed Secured Claim of Credit Management Association in Trust for Creditors | Impaired |
| Class 1.8 Claim | Allowed Secured Claim of Morgan Stanley Bank, N.A. | Impaired |
| Class 1.9 Claim | Allowed Secured Claim of Toyota Motor Credit Corp. | Unimpaired |
| Class 2 Claims | Allowed Priority Unsecured Claims except for Allowed Priority Tax Claims | Unimpaired |
| Class 3 Claims | Allowed General Unsecured Claims | Impaired |
| Class 4 Claims | Subordinated Claims of Insiders | Impaired |

**X.**

**TREATMENT OF CLAIMS**

Based on the Plan Financial Projections, the following is the Plan's treatment of Allowed Claims.

**A.    Treatment of Class 1.1 - Los Angeles County Treasurer and Tax Collector.** The treatment of the Holder of Allowed Class 1.1 Claim shall be as follows:

The Holder will receive full payment of its Allowed Claim on the Effective Date; such distribution shall include accrued interest on such Allowed Claim pursuant to Sections 506 and 511 of the Bankruptcy Code and California Revenue & Tax Code § 4102 and 4103(b).

The Holder's rights are unimpaired under the Plan.

**B.    Treatment of Classes 1.2 and 1.3 - F&M and Grant & BCG, LLC.** The treatment of the Holders of Allowed Secured Claims in Classes 1.2 through 1.3 shall be as follows:

1.    The Holders shall retain their underlying liens on the applicable real property collateral, but they are barred from pursuing their rights and remedies against the collateral until the expiration of the Sales Period; and

2.    Upon the closing of the sale transaction of the applicable real property collateral during the Sales Period, the Holders will receive a distribution to the extent of available Net Sale Proceeds from the real property collateral in accordance with the priorities set forth in the Bankruptcy Code and under applicable California law.  Such distribution shall include accrued interest on such Allowed Claims at the contract rate.

The Holders' rights are unimpaired under the Plan.

**C.    Treatment of Class 1.4 - GE Capital Public Finance, Inc.** The treatment of the Holder of an Allowed Secured Claim in Class 1.4 shall be as follows:

The Debtor will assume the Master Security Agreements and cure the pre-petition defaults, which is approximately $6,878.69.  After the Effective Date, the Debtor will continue to pay the payments under the terms of the Master Security Agreements through the term of the Master Security Agreements.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1    The Holder's rights are unimpaired under the Plan.

2    **D.    Treatment of Classes 1.5 and 1.6 - Canon Financial Services, Inc. and PNC**

3    **Equipment Finance, LLC.** The treatment of the Holder(s) of an Allowed Secured Claim in

4    Classes 1.5 and 1.6 shall be as follows:

5            1.    Allowance of Secured Claims. The Holder(s) shall be allowed a Secured

6    Claim to the extent of the value of such Holder(s)' Claim and interest in such property, which shall

7    be based on fair market value of the property (or such other value as agreed to by the Debtor and

8    the Holder(s), securing such Claim. The Debtor believes that the fair market value of the property

9    securing the claims of Canon Financial Services, Inc. and PNC Equipment Finance, LLC is

10   $20,859.00 and $100,000.00, respectively. If the Holder(s) objects to the Debtor's asserted value

11   of the property securing such Claim, then, the Debtor may elect, at its sole discretion, to:  (i) fix

12   the amount of such objecting Holder(s)' Allowed Secured Claim at the Objection Value, and (ii) in

13   lieu of making payments, and in full satisfaction of such Holder(s)' Allowed Secured Claim,

14   require that such Holder(s) repossess the property securing such Claim. In the event of such an

15   objection and the Debtor's election of the Repossession Option, then the Allowed Deficiency

16   Claim for such objecting Holder(s) shall be equal to the difference between such Holder(s)' Claim

17   and the Objection Value.

18           2.    Payment of Allowed Secured Claim. The Holder(s) shall be treated, at the

19   election of the Debtor, after consultation with the Committee, as follows:

20                   a.    Option 1. The Holder(s) will receive on account of such Allowed

21           Secured Claim deferred cash payments totaling the allowed amount of such Allowed

22           Secured Claim, equal to the value, as of the Effective Date, of such Holder(s)' interest in

23           such property. In particular, the Holder(s) shall be paid in equal monthly installments, with

24           interest, which shall accrue at the Allowable Interest Rate, commencing on the First

25           Payment Date, fully amortized a period of 24 months based on the Allowed Secured Claim.

26           The total Claim, Allowed Secured Claim (i.e., fair market value of the property securing

27           the Claim), Allowed Deficiency Claim, and monthly payments to be made to the Holder(s).

28           The Holder(s)' Allowed Secured Claim may be prepaid at any time without penalty or

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1    other charge. Notwithstanding the foregoing, in the event any collateralized equipment is

2    sold by the Reorganized Debtor, the proceeds generated from the disposition of such sale,

3    net of all expenses, shall be paid to the Holder(s) of the Allowed Secured Claim whose

4    collateral was sold, up to the amount of the Allowed Secured Claim, reflecting all

5    payments made to the Holder(s) under the terms of this Plan.

6           The Holder(s)' Allowed Secured Claims shall continue to be secured by the

7    Holder(s)' existing Lien on the applicable collateral.  Upon full satisfaction of the

8    Holder(s)' Allowed Secured Claim, the Holder(s)' Lien on its collateral shall be released

9    and the Debtor shall retain title to such collateral free and clear of the Holder(s)' Lien.  Any

10    Allowed Deficiency Claim of the Holder(s) shall be treated as an Allowed General

11    Unsecured Claim.

12          b.    Option 2.  The Holder(s)' collateral shall be returned to the

13    Holder(s) on the Effective Date in full satisfaction of Holder(s)' Allowed Secured Claim.

14    Any Allowed Deficiency Claim of the Holder(s) shall be treated as a Class 3 Allowed

15    General Unsecured Claim.

16          c.    Option 3.  Notwithstanding any contractual provision or applicable

17    law that entitles the Holder(s) of the Allowed Secured Claim to demand or to receive

18    accelerated payment of such Claim after the occurrence of a default: (i) any such default

19    shall be cured, other than a default of a kind specified in Section 365(b)(2) of the

20    Bankruptcy Code; (ii) the maturity of such Claim shall be reinstated as such maturity

21    existed before such default; (iii) the Holder(s) of such Allowed Secured Claim shall be

22    compensated for any damages incurred by such Holder(s) as a result of any reasonable

23    reliance by such Holder(s) on such contractual provision or such applicable law; and

24    (iv) the legal, equitable or contractual rights to which such Allowed Secured Claim entitles

25    the Holder(s) of such Claim shall not otherwise be altered.

26           The foregoing treatment shall be in full satisfaction of the Class 1.5 and

27    Class 1.6 Holder(s)' Allowed Secured Claim.

28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

3.    Insurance. If either Option 1 or 3 is elected by the Debtor for the Holder(s) in these Classes, then the Debtor shall maintain insurance coverage for the property securing the Claim for the Holder(s). .

The Holder(s)' rights are impaired under the Plan.

E.    **Treatment of Class 1.7 - Allowed Secured Claim of Credit Management Association in Trust for Creditors.** The treatment of the Holder of Allowed Class 1.7 shall be as follows:

1.    The Holder shall retain its underlying lien on the Personal Property Assets, but it is barred from pursuing its rights and remedies against the Personal Property Assets until the expiration of the Sales Period;

2.    If the Debtor is able to consummate a sale of the Personal Property Assets during the Sales Period, the Holder will receive a distribution to the extent of available Net Sale Proceeds from the Personal Property Assets in accordance with the priorities set forth in the Bankruptcy Code and under applicable California law.  Such distribution shall include accrued interest on such Allowed Claim at the Allowable Interest Rate; and

3.    If the Debtor is unable to consummate a sale of the Personal Property Assets during the Sales Period, the Holder shall be free to pursue its rights and remedies against the Personal Property Assets under applicable California law.

The Holder's rights are impaired under the Plan.

F.    **Treatment of Class 1.8 - Allowed Secured Claim of Morgan Stanley Bank, N.A.** The treatment of the Holder of Allowed Class 1.8 Claim shall be as follows:

The Holder may exercise its rights and remedies against its underlying collateral on the Confirmation Date.

The Holder's rights are impaired under the Plan.

G.    **Treatment of Class 1.9 – Allowed Secured Claim of Toyota Motor Credit Corp.** The treatment of the Holder of Allowed Class 1.9 Claim shall be as follows:

-36-

1    The Debtor will assume the underlying agreements on the Effective Date and cure

2 any pre-petition default.  After the Effective Date, the Debtor will continue to pay the payments

3 under the terms of the underlying agreements through the term of those agreements.

4    The Holder's rights are unimpaired under the Plan.

5   **H.** **Treatment of Class 2 - Allowed Priority Unsecured Claims.**  The treatment of

6 the Holders of Allowed General Unsecured Claim shall be as follows:

7    Each Holder of an Allowed Priority Unsecured Claim shall be paid the full amount of its

8 Allowed Priority Unsecured Claim in cash on the latest of the following dates: (i) the Effective

9 Date; (ii) the tenth (10th) Business Day after the date on which such Priority Unsecured Claim

10 becomes an Allowed Priority Unsecured Claim; or (iii) the date upon which such Allowed

11 Priority Unsecured Claim becomes due according to its terms.

12    The Holders' rights are unimpaired under the Plan.

13   **I.** **Treatment of Class 3 – Allowed General Unsecured Claims.**  The treatment of

14 the Holders of Allowed General Unsecured Claim shall be as follows:

15    1. The Holders will receive their Pro-Rata share of 85% of the remaining Net

16 Sale Proceeds from the sale of the Crystal Cathedral Campus after the Allowed Secured Claim of

17 F&M is Paid in Full;

18    2. The Holders will receive their Pro-Rata share of 100% of the remaining Net

19 Sale Proceeds from the sale of the Condominium after the Allowed Secured Claim of Grant  &

20 BCG, LLC in Paid in Full;

21    3. The Holders will receive their Pro-Rata share of 100% of the Net Sale

22 Proceeds from the sale of the Personal Property Assets  after the Allowed Secured Claim of Credit

23 Management Association in Trust for Creditors is Paid in Full; and

24    4. The Holders will receive their Pro-Rata share of monthly payments of

25 $100,000 until their claims are paid in full (estimated to be within 24 months) after the Effective

26 Date.  Such distribution shall include accrued interest on such Allowed Claim at the rate of 5.5%.

27    The Holders' rights are impaired under the Plan.

28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1    **J.**    **Treatment of Class 4 – Subordinated Claims of Insiders.**  The treatment of the

2    Holders of Allowed Insiders' Claim shall be as follows:

3        After Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Claims

4    and Allowed General Unsecured Claims are Paid in Full, the Holders of Allowed Subordinated

5    Claims of Insiders will receive their Pro-Rata share of payments until their Claims are Paid in Full

6    provided that such payments will not result in a negative monthly ending cash balance and the

7    Debtor is able to maintain a calendar year-end cash balance of at least $1,500,000.  Such

8    distribution shall not include any accrued interest on such Allowed Claims.

9        The Holders' rights are impaired under the Plan.

10                                    **XI.**

11                      **MEANS OF IMPLEMENTING THE PLAN**

12    **A.**    **Introduction.**  This article is intended to explain the means by which the Debtor

13    intends to effectuate the reorganization provided for under the Plan, and how the Debtor intends to

14    fund the obligations to Creditors undertaken in the Plan.  This article provides information

15    regarding prospective corporate governance of the Debtor, funding sources for Plan obligations,

16    and other material issues bearing upon the performance of the Plan.

17    **B.**    **Management/Board of Directors/Executive Committee.**

18        1.    Members of the Independent Board.  During the term of the Plan, the

19    Reorganized Debtor shall be controlled by the Independent Board consisting of no more than

20    seven (7) members, two (2) of whom shall be Creditor Board Members.  The Independent Board

21    will consist of the current members of the Debtor's Board: Robert H. Schuller, Arvella Schuller,

22    James Penner, Gwyn Myers, and Richard Mysse plus two Creditor Board Members, who shall be

23    designated by the Committee no later than 10 days after the Effective Date.   During the term of

24    the Plan, no more than three Insiders may concurrently serve on the Independent Board.  If any

25    member of the Independent Board resigns after the Effective Date, then the remaining Independent

26    Board Members, with the advice and consent of the Executive Committee, will select a successor

27    board member.

28

1         2.    <u>Executive Committee of the Independent Board</u>. Upon the Effective Date,

2  an Executive Committee will be formed, which will consist of three members, who will be

3  designated by the Board of Directors, after consultation with the Committee, no later than 10 days

4  after the Effective Date. The Executive Committee shall approve any significant and important

5  decisions to be made by the Reorganized Debtor, including, without limitation, any of the

6  following: (a) approval of an annual Budget; (b) capital expenditures above approved budgeted

7  amounts in excess of $10,000; (c) any other extraordinary expenditure; (d) acquisitions or

8  divestitures of any business or any assets (other than inventory in the normal course of business);

9  (e) entering into contracts or obligations for amounts in excess of $10,000; (f) compliance with the

10  terms of this Plan; or (g) bankruptcy or other insolvency related action, any liquidation or

11  dissolution, or any similar action. At no time during the term of the Plan may an Insider serve on

12  the Executive Committee.

13         3.    <u>No Compensation for Members of the Independent Board or the Executive</u>

14  <u>Committee</u>. No member of the Independent Board or the Executive Committee will receive any

15  compensation of any kind for services rendered as a board member or an executive committee

16  member during the term of the Plan.

17     **C.**    **Compensation of Insiders.** A list of the Insiders who will receive compensation

18  from the Debtor and the amount of such compensation is attached hereto as Exhibit "3."

19     **D.**    **Compensation of Dr. Sheila Schuller Coleman.** Following the Effective Date,

20  Dr. Schuller Coleman will receive an annual salary of $69,525.04 plus certain life and medical

21  benefits for her services as Chief Executive Officer of the Debtor.

22     **E.**    **Compensation of the Chief Financial Officer.** Within 10 days after the Effective

23  Date, the Independent Board, with the advice of the Creditor Board Members, will select the

24  Debtor's Chief Financial Officer. The Chief Financial Officer will receive an annual salary not to

25  exceed $300,000 plus certain medical benefits for his/her services.

26     **F.**    **Corporate Actions.** On the Effective Date, all actions contemplated by the Plan

27  shall be deemed authorized and approved in all respects (subject to the provisions of the Plan) by

28  virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1   applicable state law and without any requirement of further action by the officers or directors of

2   the Debtor or the Reorganized Debtor.  All matters provided for under the Plan involving the

3   corporate structure of the Debtor or Reorganized Debtor and any corporate action required by the

4   Debtor or by the Reorganized Debtor in connection with the Plan shall be deemed to have

5   occurred and shall be in effect pursuant to the Bankruptcy Code, without any requirement of

6   further action by the officers or directors of the Debtor or Reorganized Debtor.  On the Effective

7   Date, the officers of the Reorganized Debtor are authorized and directed to implement the

8   provisions by the Plan and any other agreements, documents and instruments contemplated by the

9   Plan in the name of and on behalf of the Reorganized Debtor.

10       **G.**     **Transfer of Estate Property to Reorganized Debtor.**  Except as otherwise

11   specifically provided in the Plan, on the Effective Date, all property and rights of the Estate of each

12   of the Debtor shall be transferred to each of the Reorganized Debtor free and clear of all Claims,

13   Liens, and rights of Creditors.  Subject to the provisions of the Plan, such property and rights to be

14   transferred to, the Reorganized Debtor include, without limitation, all alter ego and derivative

15   claims existing as of the Effective Date, and all other Avoidance Action claims.  As of the

16   Effective Date, the Reorganized Debtor may operate its ministry and use, acquire, and dispose of

17   property and settle and compromise Claims without the supervision of, or any authorization from,

18   the Bankruptcy Court or the United States Trustee, and free of any restriction of the Bankruptcy

19   Code or Bankruptcy Rules, other than those restrictions specifically provided for in the Plan or the

20   Confirmation Order.  As of the Effective Date, all property of the Reorganized Debtor shall be free

21   and clear of all Claims, Liens, and other rights of Creditors, except as otherwise expressly

22   provided herein.

23       **H.**     **Funding of the Plan.**  The Plan will be funded from three sources: (1)

24   approximately $47 million from the sale of substantially all of the Debtor's Real Estate Assets; (2)

25   approximately $3.0 million from a combination of Cash on the Effective Date and cash flow from

26   the Debtor's continued operation of its ministry; and (3) approximately $750,000.00 from the sale

27   of the Personal Property Assets.

28

1      4.      The Sale of the Real Property Assets.    The Crystal Cathedral Campus

2    consists of approximately 30 acres of improved commercial property located in Garden

3    Grove, California. The Crystal Cathedral Campus is currently subdivided into the

4    following two parcels: (1) the Crystal Cathedral, Art Gallery and Family Lounge,

5    Arboretum, Tower of Hope, Welcoming Center, the Memorial Gardens (collectively, the

6    Core Church Buildings"), and several surface parking lots (the "Parking Areas"); and (2)

7    the Family Life Center ("FLC").   The Debtor, with the advice of its professionals, has

8    determined that it can best maximize the purchase price for the Crystal Cathedral Campus

9    by a sale in which the Reorganized Debtor will agree to cooperate with the buyer by

10    subdividing the property into as many as five parcels, two of which will be utilized for the

11    development and construction of multi-family residential units and the construction of a

12    parking structure on the third parcel (currently being used as surface parking). A

13    conceptual site plan of the proposed parcels, their existing and proposed uses, and the lot

14    line adjustments for the Crystal Cathedral Campus is attached hereto as Exhibit "4."

15      The Debtor has been actively marketing the FLC since before the Petition Date and

16    has been fielding and responding to inquiries from various interested parties for the Crystal

17    Cathedral Campus in recent months. In addition to leveraging the network of FTI

18    Consulting, Inc. to reach out and market the sale opportunity for the Crystal Cathedral

19    Campus, the Debtor is in the process of retaining CB Richard Ellis, Inc. ("CBRE"), the

20    world's largest real estate services company, as its real estate brokers to market the sale of

21    the Crystal Cathedral Campus. CBRE, which has more than 300 offices and 31,000

22    employees throughout the world, has identified potential purchasers based on the type of

23    real property, price, location, time sensitivity, and other relevant factors. CBRE contacted

24    numerous investors who fit the profile representing the most likely investors to be interested

25    in and capable of serving as a stalking horse bidder for the Crystal Cathedral Campus.

26    Based on these efforts, the Debtor received several oral and written offers and other

27    expressions of interest. After extensive analysis, the Debtor determined that the offer by

28    Greenlaw Partners, LLC ("Greenlaw"), was the highest and otherwise best offer.  In

addition to paying a fair price for the property, the Greenlaw offer also contains a leaseback

and option to repurchase component that will allow the Debtor to continue operations

unabated post-closing. That offer is set forth in the letter of intent dated May 23, 2011

("LOI"), attached hereto as Exhibit "5." The following is a summary of the proposed

material provisions of the sale of the Crystal Cathedral Campus to Greenlaw pursuant to the

LOI (and to the extent of any inconsistency, the LOI controls):

      a.    Assets to Be Acquired. Greenlaw will acquire the following assets:

the Crystal Cathedral Campus, including seven (7) buildings, all rights, privileges,

easements, benefits and appurtenanes thereto, all tangible and intangible personal

property, and all other personal property assets necessary to operate the foregoing.

      b.    Consideration. Greenlaw has offered to purchase the Crystal

Cathedral Campus, subject to the lease provisions set forth below, for forty-six

million dollars ($46,000,000), of which $16 million is allocated to the FLC and $30

million is allocated to the remainder of the campus. Greenlaw will deposit an

aggregate of $900,000 into escrow, which will become nonrefundable after the

release of certain contingencies.

      c.    Debtor's Leaseback of the FLC, the Core Church Buildings and the

Parking Areas. The Debtor and Greenlaw will enter into a lease agreement for the

FLC, the Core Church Buildings and the Parking Areas. The monthly lease

payment for the FLC is $95,000, NNN, with a 3% annual increase; the lease term is

two years. Greenlaw will have space recapture and lease termination rights that

will allow it to re-lease the buildings to third parties in return for a pro-rata

reduction or total elimination of the Debtor's lease payments. The monthly lease

payment for the Core Church Buildings and Parking Areas is $212,000, NNN, with

a 3% annual increase; the lease term is 15 years. Greenlaw will have the right to

recapture and terminate the lease on the Parking Areas upon receipt of entitlements

for the development of multi-family residential units; if that occurs, the Debtor's

monthly lease payments will be reduced to $170,000, NNN.

d.    Debtor's right to Repurchase the Core Church Buildings. The Debtor will have the right to repurchase the Core Church Buildings including any reciprocal parking rights for $30 million plus closing costs for the first 48 months of the lease. After the expiration of the 48 month period, the Debtor will have the first right of refusal to purchase the Crystal Cathedral with 30 days to elect to proceed and 30 days to close upon written notice from Greenlaw.   The Debtor will receive a reduction in the purchase price depending on the amount of Greenlaw's receipt of funds associated with the future sale of the apartment land site at the value of $20,000 per unit. For example, if Greenlaw constructs 400 units, the Debtor's purchase price will be reduced by $8,000,000.

e.    Due Diligence and Closing. After the execution of the asset purchase agreement, Greenlaw will have a 60 day period in which to conduct due diligence. The closing will occur within 30 days of the due diligence period.

The LOI represents the highest bid that the Debtor has received to date for the Crystal Cathedral Campus. It is subject to overbid pursuant to the Bid Procedures. The Debtor and CBRE are continuing their marketing efforts and will be working with all parties that have expressed an interest in participating in the overbidding process. In addition, both FTI and CBRE will continue to contact their national and international network of clients that may be interested in acquiring the Crystal Cathedral Campus.

The Debtor has listed the Condominium for sale with Prudential California Realty for $999,000 based on recent comparable sales.

5.    The Continued Operations of the Ministry. Based on the reduction of its operating budget proposed by its professionals after the Confirmation Date, the Debtor believes that it will generate sufficient revenue during the term of the Plan to make monthly payments of $100,000.00 to the Holders of Allowed General Unsecured Claims until such claims are paid in full.

6.    The Sale of Personal Property Assets. Prior to the Effective Date, the Reorganized Debtor will actively market the Personal Property Assets, which it believes will generate $750,000.00 in sale proceeds.

As the financial projections attached hereto as Exhibit "6" indicate, the Debtor projects that there will be sufficient cash flow from sale of the Real Estate Assets, the continued operations of the ministry, and the sale of the Personal Property Assets to fund the Plan.  The funds necessary to meet the Debtor's obligations on the Effective Date of the Plan will be obtained from the Debtor's current cash on hand, which was approximately $4,550,000.00 as of May 1, 2011.  As the Debtor's financial projections indicate, the Debtor projects that it will have cash sufficient to meet all of the obligations provided for in the Plan.

**I.**      **Post-Confirmation Committee**.  The Committee shall continue to exist after the Confirmation Date so long as it is comprised of at least 3 members (the "Post-Confirmation Committee").  The Post-Confirmation Committee's duties will include: (1) consulting with the Reorganized Debtor with regarding to the consummation of the Plan; (2) investigating the financial condition of the Reorganized Debtor, the operation of the Reorganized Debtor's business and other matters relevant to the consummation of the Plan; and (3)  enforcing, filing, litigating, prosecuting, settling and collecting (on behalf of the Estate) the Estate Claims.  Notwithstanding the rights of the Post-Confirmation Committee with respect to Estate Claims, nothing in the Plan shall require the Post-Confirmation Committee to prosecute or litigate any such matters, all of which may be determined by the Post-Confirmation Committee in the exercise of its sole and absolute discretion.   The Post-Confirmation Committee will be entitled to retain counsel and its reasonable fees and expenses will be paid from the monthly distributions to Class 3 under the Plan.

**J.**      **Compliance with California State Law Governing the Transfer of Property by a Nonprofit Corporation**.  The Debtor will comply with applicable California state law governing the transfer of property by a nonprofit corporation.

**NEITHER THE DEBTOR NOR THE COMMITTEE HAVE  DETERMINED WHETHER ANY ESTATE CLAIMS EXIST, INCLUDING, WITHOUT LIMITATION, WHETHER THERE ARE ANY AVOIDANCE ACTIONS THAT MAY BE FILED BY THE POST-CONFIRMATION COMMITTEE AFTER THE CONFIRMATION DATE. THIS INVESTIGATION IS ONGOING AND WILL OCCUR, IN LARGE PART, AFTER THE CONFIRMATION DATE. AS A RESULT, ALL PARTIES-IN-INTEREST ARE**

1    **HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE**

2    **EXISTENCE OF ANY PARTICULAR AVOIDANCE ACTION OR OTHER ESTATE**

3    **CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN**

4    **AVOIDANCE ACTION OR OTHER ESTATE CLAIM MAY BE FILED AGAINST ANY**

5    **CREDITOR OR OTHER PARTY AT ANY TIME.**

6        **K.**      **Avoidance Actions**. Notwithstanding anything to the contrary herein, one hundred

7    percent (100%) of any Net Proceeds recovered, either before or after the Effective Date, from

8    prosecution or settlement of Avoidance Action claims shall be paid in the following Order:

9    (i) first, to Creditors holding Allowed Administrative Claims and Allowed Cure Claims, based on

10    the pro rata share of such Claims, up to an amount that, in conjunction with other payments made

11    to these Creditors under the Plan, renders such Creditors Paid in Full; (ii) second, to Creditors

12    holding Allowed Priority Tax Claims, up to an amount that, in conjunction with other payments

13    made to these Creditors under the Plan, renders such Creditors Paid in Full; (iii) third, to Creditors

14    holding Allowed General Unsecured Claims, up to an amount that, in conjunction with other

15    payments made to these Creditors under the Plan, renders such Creditors Paid in Full; and (iv)

16    fourth, to Creditors holding Allowed Subordinated Insider Claims, up to an amount, that in

17    connection with other payments made to these Creditors under the Plan, renders such Creditors

18    Paid in Full. Within three Business Days after the Debtor receive any such Net Proceeds, the

19    Debtor shall deposit such proceeds into an interest-bearing, segregated account for the benefit of

20    the foregoing from which no disbursements shall be made except for the purpose of funding

21    Distributions hereunder to the foregoing Creditors. The Debtor shall use the funds held in this

22    account to make distributions pursuant to the terms of the Plan. Allowed Claims of the foregoing

23    Creditors shall be credited by the amount of Net Proceeds paid to Creditors of such Claims.

24        **L.**      **Disposition of Assets.** From and after the Effective Date, the Reorganized Debtor

25    shall be entitled to sell, transfer, encumber or otherwise dispose of any interest in any of its assets,

26    without any need for obtaining any approval of the Bankruptcy Court.

27        **M.**      **Compromise of Controversies.** From and after the Effective Date, the

28    Reorganized Debtor and the Post-Confirmation Committee shall be entitled to compromise any

1 objections to Disputed Claims, or any controversies relating to Post-Confirmation Estate Claims,

2 Avoidance Actions or other litigation pending after the Confirmation Date without any need for

3 any notice to Creditors or any approval of the Bankruptcy Court.

4       **N.**     **Bankruptcy Court Approval Relative to Post-Confirmation Matters.** Nothing

5 contained in the Plan shall be deemed to impair in any manner the right of the Reorganized

6 Debtor, the Post-Confirmation Committee or any party-in-interest to seek at any time after the

7 Effective Date orders of the Bankruptcy Court approving actions to be taken consistent with the

8 Plan as may be necessary or desirable to effectuate the provisions of the Plan.

9       **O.**     **Debtor's Right of Setoff.** Pursuant to Section 553 of the Bankruptcy Code or

10 applicable non-bankruptcy law, the Debtor may set off against any Allowed Claim and

11 Distribution to be made pursuant to the Plan on account of such Allowed Claim (before any

12 Distribution is made on account of such Allowed Claim), any account stated, claim, right, or cause

13 of action which the Debtor or the Estate may possess against the holder of such Allowed Claim;

14 provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim

15 shall constitute a waiver or release by the Debtor or the Estate of any such account, claim, right,

16 and cause of action that the Debtor or the Estate may possess against the holder of such Allowed

17 Claim. To the extent that the Debtor in allowing a Claim fails to effect a setoff with a Creditor and

18 seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to the

19 Plan, the Debtor shall be entitled to full recovery on its claim against such Creditor,

20 notwithstanding any payment of the Creditor's Allowed Claim pursuant to the Plan.

21       In accordance with the provisions of Section 553 of the Bankruptcy Code, the Internal

22 Revenue Service shall be entitled to set off against any amounts that the Internal Revenue Service

23 may owe to the Debtor on account of overpayments by the Debtor of pre-confirmation taxes any

24 pre-confirmation tax liabilities that the Debtor may owe to the Internal Revenue Service.

25       **P.**     **Cash Payments.** Cash payments made pursuant to the Plan shall be in United

26 States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor or by wire

27 transfer from a domestic bank, at the option of the Reorganized Debtor.

28

1   **Q.**     **Reorganized Debtor's Certification.**  On or before the date upon which the

2   Reorganized Debtor determine, in its sole and absolute discretion, that all Allowed Claims have

3   been duly paid and that all Post-Confirmation Estate Claims and objections to Disputed Claims

4   have been resolved by Final Order, the Reorganized Debtor shall file with the Bankruptcy Court

5   and serve the Reorganized Debtor's Certification upon the United States Trustee.

6                                    **XII.**

7                           **DISTRIBUTIONS**

8   **A.**     **Distribution Agent.**  The Reorganized Debtor shall serve as the Distribution Agent

9   for Distributions to be made to holders of Allowed Claims.  The Distribution Agent may employ

10  one or more sub-agents on such terms and conditions as it deems appropriate in the exercise of its

11  sole and absolute discretion.  The Distribution Agent shall not be required to provide any bond in

12  connection with the making of any Distributions pursuant to the Plan nor will it receive any fees or

13  costs for its services.

14  **B.**     **Distributions.**

15          1.     Dates of Distributions.  Any Distribution required to be made on the

16  Effective Date shall be deemed timely if made as soon as practicable after such date and, in any

17  event, within fifteen (15) days after such date.  Any Distribution required to be made upon a

18  Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be

19  deemed timely if made as soon as practicable thereafter but, in any event, within fifteen (15) days

20  thereafter.

21          2.     Limitation on Liability.  Neither the Debtor, the Reorganized Debtor, its

22  respective affiliates, the Committee, nor any of its respective employees, members, officers,

23  directors, agents, or Professionals shall be liable for (i) any acts or omissions (except for willful

24  misconduct) in connection with implementing the Distribution provisions of the Plan and the

25  making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of

26  Distributions made pursuant to the Plan resulting from any delays in making such Distributions in

27  accordance with the terms of the Plan (including, but not limited to, any delays caused by the

28  resolution of Disputed Claims).

-47-

**C.**   **Instruments**.

1.   Rights of Persons Holding Instruments.  Except as otherwise provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all Instruments evidencing or relating to any Claims shall be deemed automatically cancelled and deemed void and of no further force or effect, without any further action on the part of any person, and any Claims evidenced by or relating to such Instruments shall be deemed discharged.

2.   Cancellation of Liens.  Except as otherwise provided herein, any Lien securing any Secured Claim shall be deemed released and discharged, and the Creditor holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtor (including, without limitation, any cash collateral) held by such Creditor and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including, without limitation, by the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtor.

**D.**   **De Minimis Distributions.**  No Cash payment of less than ten dollars ($10.00) shall be made by the Reorganized Debtor to any Creditor.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a consequence of this section shall, after the last Distribution on account of Allowed Claims in the applicable Class, be treated as Unclaimed Property under the Plan.

**E.**   **Delivery of Distributions.**  Except as provided in the Plan with respect to Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (i) with respect to each holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of Claim; (ii) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Debtor; provided, however, that, if the Debtor or the Reorganized Debtor have received a written notice of a change of address for such Creditor, the address set forth in such notice shall be used; or (iii) with respect to each holder of an Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

**F.     Undeliverable Distributions.** No further distribution of Unclaimed Property shall be made to a Creditor unless and until the Reorganized Debtor are notified in writing of such Creditor's then current address. Subject to the provisions of Section G hereof, Unclaimed Property shall remain in the possession of the Reorganized Debtor pursuant to Section G, and shall be set aside and held in the Unclaimed Property Reserve to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Plan shall require the Reorganized Debtor or any other person to attempt to locate such Creditor.

**G.     Disposition of Unclaimed Property**. If the Creditor entitled to a Distribution of Unclaimed Property notifies the Reorganized Debtor of such Creditor's claim to the Distribution of such Unclaimed Property within nine (9) months following the Initial Distribution Date, the Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property Reserve and paid to such Creditor within fifteen (15) days thereof. Any Holder of an Allowed Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed Property held by the Reorganized Debtor within nine (9) months following the Initial Distribution Date shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under the Plan or otherwise from the Reorganized Debtor. In such cases, any such Unclaimed Property shall be retained by the Reorganized Debtor, shall not be subject to the unclaimed property or escheat laws of any state or other governmental unit, and shall be distributed on account of Allowed General Unsecured Claims at the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant to the Plan.

**XIII.**

**OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

**A.     Objections to Claims**. The Reorganized Debtor and the Post-Confirmation Committee shall have the right to file objections to Claims. Unless another date is established by order of the Bankruptcy Court, any objection to a Claim shall be filed with the Bankruptcy Court and served on the Reorganized Debtor or the Post-Confirmation Committee as the case may be, and the Creditor holding such Claim on or before the applicable Claims Objection Deadline. The

1   Reorganized Debtor and the Post-Confirmation Committee shall have the right to request that the

2   Bankruptcy Court extend the Claims Objection Deadline.

3       **B.**    **Schedule of Disputed Claims**. The Debtor shall file and serve the Disputed

4   Claims Schedule on the Committee on or before the twenty-fourth (24th) day prior to the

5   Confirmation Hearing. The Debtor reserves the right to amend the Disputed Claims Schedule, by

6   adding or deleting Claims, as the Debtor deem appropriate in the exercise of its sole and absolute

7   discretion.

8       Notwithstanding the fact that the Reorganized Debtor shall have the right to file, litigate,

9   and settle objections to Disputed Claims on behalf of the Debtor and Estate, nothing contained

10   herein shall be deemed to obligate the Reorganized Debtor to take any such actions, all of which

11   shall be determined by the Reorganized Debtor in its sole and absolute discretion.

12   **THE DEBTOR HAS NOT FULLY REVIEWED THE CLAIMS IN THE CASE OR**

13   **DETERMINED WHETHER OBJECTIONS TO CLAIMS EXIST. THIS**

14   **INVESTIGATION IS ONGOING AND MAY OCCUR, IN LARGE PART, AFTER THE**

15   **CONFIRMATION DATE. AS A RESULT, CREDITORS AND OTHER PARTIES-IN-**

16   **INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THAT THE**

17   **EXISTENCE OF ANY PARTICULAR OBJECTION TO A DISPUTED CLAIM MAY NOT**

18   **BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN, AN OBJECTION TO A**

19   **CLAIM MAY BE FILED AGAINST ANY CREDITOR OR PARTY-IN-INTEREST AT**

20   **ANY TIME, SUBJECT TO THE CLAIMS OBJECTION DEADLINE. THE DEBTOR**

21   **AND THE REORGANIZED DEBTOR HEREBY RESERVE THE RIGHT TO OBJECT**

22   **TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTOR, OR REFLECTED**

23   **IN THE DEBTOR'S BOOKS AND RECORDS, AND WHICH ARE FOUND TO BE**

24   **OBJECTIONABLE IN ANY RESPECT.**

25       **C.**    **Treatment of Disputed Claims**.

26       1.    No Distribution Pending Allowance. If any portion of a Claim is a Disputed

27   Claim, no Distribution provided for under the Plan shall be made on account of such Claim unless

28   and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1           2.     Distribution After Allowance.  Within thirty (30) days following the date on

2  which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the

3  Distribution Agent shall distribute to the Creditor holding such Allowed Claim any Cash that

4  would have been distributable to such Creditor if, at the time of the making of any Distribution to

5  the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a

6  Disputed Claim.

7           3.     Reserves for Disputed Claims.  In the event that a Disputed Claim is

8  pending as to a Class 3 Creditor, the Distribution Agent shall establish a Disputed Claims Reserve,

9  and maintain a reasonable reserve necessary to pay such Disputed Claim. No disbursement of

10  funds from the Disputed Claims Reserve shall be made on account of a Disputed Claim until such

11  Disputed Claim has been determined by a Final Order of the Bankruptcy Court.  In the event that

12  any Disputed Claim is ultimately disallowed by the Bankruptcy Court, the amount reserved for

13  such Disputed Claim, which has been disallowed by the Bankruptcy Court, shall be distributed on

14  account of Allowed General Unsecured Claims at the time when the succeeding Distribution is to

15  be paid to General Unsecured Creditors.

16                                    **XIV.**

17                **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

18     **A.**    **Executory Contracts Being Assumed**.  Effective as of, and conditioned on, the

19  occurrence of the Effective Date, the Debtor will assume all of the executory contracts and

20  unexpired leases of the Debtor, including, without limitation, those executory contracts and

21  unexpired leases of the Debtor listed on Schedule 9.1of the Plan, except only for those executory

22  contracts and unexpired leases set forth in Schedule 9.3 of the Plan.

23        The Debtor may amend Schedule 9.1 of the Plan to add thereto any executory contract or

24  unexpired leases, or to delete therefrom any executory contract or lease, up to and including the

25  Confirmation Date.  However, if any amendments are made to Schedule 9.1 of the Plan less than

26  twenty-four (24) days before the Confirmation Date, the affected contract or lease parties shall

27  have fifteen (15) days from the date of service of notice of such amendments within which to serve

28  on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1  shall promptly set a hearing on the same, and the assumption or rejection of the affected contract

2  or lease shall be delayed until the Bankruptcy Court makes a determination on this issue (such

3  determination may be made after the Confirmation Date, without delaying the confirmation of this

4  Plan). To the extent that an executory contract or unexpired lease has been assumed prior to the

5  Confirmation Date by a Debtor pursuant to an order of the Bankruptcy Court, such assumption

6  shall not be affected by the Plan. The assumption of any contract or lease pursuant to the

7  provisions of the Section 9.1 of the Plan shall be only to the extent that such assumed contract or

8  lease constitutes an executory contract or unexpired lease within the meaning of Section 365 of the

9  Bankruptcy Code. Inclusion of an agreement in Schedule 9.1 of the Plan does not constitute an

10  admission by the Debtor or Reorganized Debtor that (i) such agreement is an executory contract or

11  unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii) the Debtor must

12  assume such agreement in order to continue to receive or retain rights, benefits, or performance

13  thereunder or that any Claim under such agreement must be paid or default cured, or (iii) such

14  agreement is a valid contract or lease. Any contract or lease assumed pursuant to the Plan shall be

15  assumed as previously amended or otherwise modified by the parties thereto, whether before or

16  after the Petition Date.

17      **B.   Payment of Cure Claims.** The Debtor shall be liable and responsible for the

18  payment of all Allowed Cure Claims as set forth on Schedule 9.1 of the Plan. The Debtor shall

19  pay all Allowed Cured Claims in full on the Effective Date.

20      **C.   Executory Contracts Being Rejected.** The Debtor hereby rejects all of the

21  executory contracts and unexpired leases listed on Schedule 9.3 to the Plan. The Debtor reserves

22  the right to amend Schedule 9.3 add thereto any executory contracts or leases, or to delete

23  therefrom any executory contract or unexpired lease, up to and including the Confirmation Date.

24  However, if any amendments are made to Schedule 9.3 later than twenty-four (24) days before the

25  Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the date

26  of service of notice of such amendments within which to serve on the Debtor a written objection to

27  the same. Upon receipt of any such objection, the Debtor shall promptly set a hearing on the same,

28  and the rejection of the affected contract or lease shall be delayed until the Bankruptcy Court

1   makes a determination on this issue (such determination may be made after the Confirmation Date,

2   without delaying the confirmation of the Plan).  To the extent that an executory contract or

3   unexpired lease has been rejected by the Debtor prior to the Confirmation Date pursuant to an

4   order of the Bankruptcy Court, such rejection shall not be affected by the Plan.

5   **D.      Retention of Property Rights By Reorganized Debtor**.  To the extent that an

6   agreement that provides the Debtor with property rights does not constitute an executory contract

7   or unexpired lease, or the Debtor have obtained property rights under the executed portion of an

8   executory contract or unexpired lease, rejection of such agreement shall not constitute an

9   abandonment by the Debtor of any such property rights.

10   **E.      Bar Date for Rejection Damages**.  Any Claim arising out of the rejection of an

11   executory contract or unexpired lease shall be forever barred and shall not be enforceable against

12   the Debtor, the Reorganized Debtor, its affiliates, its successors, Estate, or its properties, and shall

13   not be entitled to any Distribution under the Plan, unless a Proof of Claim for such Rejection

14   Claim is filed and served on the Debtor or Reorganized Debtor within thirty (30) days after the

15   later of (i) the date of entry of the order of the Bankruptcy Court approving the rejection of the

16   executory contract or unexpired lease, or (ii) the Confirmation Date.

17   **F.      Claims Schedule**.  The Cure Claims Schedule shall be filed with the Bankruptcy

18   Court, and served on the Committee and the non-debtor parties to such executory contracts and

19   unexpired leases, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

20   Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be

21   filed and served upon counsel for the Debtor and the Committee on or before the fourteenth

22   (14th) day prior to the Confirmation Hearing.  In the event that any such objection to the amount

23   stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the

24   amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the

25   Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims

26   Schedule shall be waived and shall be forever barred in the Case, without further notice.  If the

27   Debtor cannot resolve any such objections with the Creditor, the Debtor may either (i) elect to

28   reject the executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the

1  Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing
2  (without delaying the confirmation of the Plan). Any amount of Cure Claim payable upon the
3  assumption of an executory contract or unexpired lease shall be due and payable on or before the
4  fifteenth (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then
5  only in the amount fixed by such Final Order.

6  ## XV.

7  ## TAX CONSEQUENCES OF THE PLAN

8  **A.**    **Introduction.** The implementation of the Plan may have federal, state and local
9  tax consequences to the Debtor's Creditors. No tax opinion has been sought or will be obtained
10  with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute,
11  and is not intended to constitute, either a tax opinion or tax advice to any person, and the summary
12  contained herein is provided for informational purposes only.

13       The discussion below summarizes only certain of the federal income tax consequences
14  associated with the Plan's implementation. This discussion does not attempt to comment on all
15  aspects of the federal income tax consequences associated with the Plan, nor does it attempt to
16  consider various facts or limitations applicable to any particular Creditor which may modify or
17  alter the consequences described herein. A Creditor may find that the tax consequences of the
18  Plan to such Creditor differ materially from the tax consequences discussed below because of such
19  Creditor's facts and circumstances. This discussion does not address state, local or foreign tax
20  consequences or the consequences of any federal tax other than the federal income tax.

21       The following discussion is based upon the provisions of the Internal Revenue Code of
22  1986, as amended (the "Internal Revenue Code"), the regulations promulgated thereunder, and
23  existing judicial decisions and administrative rulings. In light of the rapidly-changing nature of tax
24  law, no assurance can be given that legislative, judicial or administrative changes will not be
25  forthcoming that would affect the accuracy of the discussion below. Any such changes could be
26  material and could be retroactive with respect to the transactions entered into or completed prior to
27  the enactment or promulgation thereof. The tax consequences of certain aspects of the Plan are
28

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1 | uncertain due to the lack of applicable legal authority and may be subject to judicial or

2 | administrative interpretations that differ from the discussion below.

3 | CREDITORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS

4 | REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE

5 | TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE,

6 | LOCAL AND FOREIGN TAX CONSEQUENCES.

7 | **B.** **Federal Income Tax Consequences to the Debtor.** The Debtor is a nonprofit

8 | corporation under Internal Revenue Code § 501(c)(3). Accordingly, the Debtor is exempt from

9 | paying federal and state taxes, the consummation of the Plan will not result in any federal income

10 | tax consequences to the Debtor.

11 | **C.** **Tax Consequences To Creditors.** A Creditor who receives a Distribution on his or

12 | her Claim that is less than the Creditor's adjusted basis in such Claim may be entitled to claim a

13 | bad debt deduction for this difference. A bad debt deduction is allowed in the taxable year of the

14 | Creditor in which a debt becomes wholly worthless. The discharge of a Claim pursuant to the Plan

15 | establishes that such Claim is wholly worthless as of the date of discharge (assuming the holder of

16 | the Claim receives no consideration under the Plan with respect to such Claim). It is possible,

17 | however, that such Claim may have become wholly worthless on an earlier date, depending upon

18 | all the facts and circumstances. The Debtor expresses no opinion regarding the date or dates on

19 | which Claims discharged under the Plan became worthless.

20 | **XVI.**

21 | **CONFIRMATION REQUIREMENTS AND PROCEDURES**

22 | **A.** **Introduction.** PERSONS OR ENTITIES CONCERNED WITH

23 | CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD

24 | CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A

25 | PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended

26 | solely for the purpose of alerting readers about basic confirmation issues, which they may wish to

27 | consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DO NOT

28 |

MAINDOCS-#162295-v1-Crystal_Disclosure_Statement(Final).DOC

1 | represent that the discussion contained below is a complete summary of the law on this topic and
2 | are not providing any legal opinions with respect thereto.

3 | Many requirements must be met before a Bankruptcy Court can confirm a Chapter 11 plan.
4 | Some of the requirements include that the plan must be proposed in good faith, the distributions to
5 | non-accepting creditors and impaired classes must be at least as much as such creditors would
6 | receive in a Chapter 7 liquidation, and the plan must be feasible. These requirements are <u>not</u> the
7 | only requirements for confirmation.

8 | **B.** **Who May Object to Confirmation of the Plan.** Any party-in-interest may object
9 | to the confirmation of the Plan, but, as explained below, not every party-in-interest is entitled to
10 | vote to accept or reject the Plan.

11 | **C.** **Who May Vote to Accept/Reject the Plan.** A Creditor has a right to vote for or
12 | against the Plan if that Creditor has a Claim that is both (1) Allowed or allowed for voting
13 | purposes and (2) classified in an impaired Class.

14 | 1. What Is an Allowed Claim. As noted above, a Creditor must first have an
15 | Allowed Claim or Interest to have the right to vote. Generally, a Proof of Claim will be allowed,
16 | unless a party-in-interest brings a motion objecting to the Claim. When an objection to a Claim is
17 | filed, the Creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and a
18 | hearing, either overrules the objection or allows the Claim for voting purposes.

19 | 2. What Is an Impaired Class of Claim(s). As noted above, the holder of an
20 | Allowed Claim has the right to vote on the Plan only if it is in a Class that is impaired under the
21 | Plan. A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the holders
22 | of Claims in that Class, with certain exceptions.

23 | The Debtor believes that Classes 1.5 – 1.9, Class 3 and Class 4 are impaired under
24 | the Plan. Parties who dispute the Debtor's characterization of their Claim as being in an impaired
25 | or unimpaired Class may file an objection to the Plan contending that the Debtor have incorrectly
26 | characterized the Class.

27 | **D.** **Who Is Not Entitled to Vote.** The following four types of Claims are <u>not</u> entitled
28 | to vote on the Plan: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes;