Todd C. Ringstad (State Bar No. 97345)
todd@ringstadlaw.com
Nanette D. Sanders (State Bar No. 120169)
nanette@ringstadlaw.com
RINGSTAD & SANDERS LLP
2030 Main Street, 12th Floor
Irvine, CA 92614
Telephone: 949.851.7450
Facsimile: 949.851.6926

Counsel for Committee of Creditors Holding
Unsecured Claims

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| In re | CASE NO. 8:10-bk-24771-RK |
|---|---|
| CRYSTAL CATHEDRAL MINISTRIES, | Chapter 11 Proceeding |
| Debtor and Debtor-in-Possession. | OBJECTION BY OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS TO DEBTOR'S DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION; DECLARATION OF BRIAN S. WEISS, FINANCIAL ADVISOR TO COMMITTEE<br><br>DATE:   July 13, 2011<br>TIME:   11:00 a.m.<br>PLACE:  Courtroom 5D |

TO THE HONORABLE ROBERT KWAN, UNITED STATES BANKRUPTCY JUDGE, OFFICE OF THE UNITED STATES TRUSTEE, AND TO ALL INTERESTED PARTIES:

The Official Committee of Creditors Holding Unsecured Claims (the "Committee"), appointed in the bankruptcy case of *In re Crystal Cathedral Ministries* (the "Debtor" or "CCM"), hereby respectfully submits this Objection to the Debtor's Disclosure Statement to Accompany Debtor's Chapter 11 Plan or Reorganization (the "Disclosure Statement").

I.

## THE DISCLOSURE STATEMENT MUST CONTAIN SUFFICIENT INFORMATION TO ALLOW CREDITORS TO MAKE INFORMED JUDGMENT ABOUT THE PLAN

Under section 1125(b) of the Bankruptcy Code, acceptances of a plan cannot be solicited unless the plan is accompanied by a disclosure statement that has been approved by the Court as containing "adequate information." "Adequate Information" is defined in section 1125(a)(1), "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."

In this case, the information provided by the proposed Disclosure Statement is incomplete, misleading, erroneous and insufficient.

II.

## THE DISCLOSURE STATEMENT FILED BY THE DEBTOR DOES NOT CONTAIN ADEQUATE INFORMATION AND IS MISLEADING WITH RESPECT TO THE INFORMATION PROVIDED.

In a number of significant material respects, the Disclosure Statement either fails to adequately describe material aspects of the Plan, or provides vague or misleading information. In order for the Disclosure Statement to contain adequate information to allow the creditors to make an informed judgment on the Plan, these aspects of the Disclosure Statement must be significantly modified.

### A. The Disclosure Statement Fails to Adequately Describe the Diversion of Sale Proceeds to Fund the Debtor's Continuing Operating Losses.

The Plan provides that the GUCs will receive "their Pro-Rata share of 85% of the remaining Net Sale Proceeds from the sale of the Crystal Cathedral Campus after the Allowed Secured Claim of F&M is Paid in Full." See Plan at Section 5.9.1. Thus, 15% of the Net Sales Proceeds are being diverted to the Debtor. The Disclosure Statement fails to adequately describe

these circumstances and the consequences of the diversion of sale proceeds.

The Disclosure Statement does not clearly provide to creditors an estimate of the amount of Net Sales Proceeds that are being diverted to the Debtor. The Committee estimates that this amount will be approximately $1,570,000 in proceeds from the sale of the most valuable asset of the estate that, instead of being use to pay the outstanding claims of creditors, will be funneled to the Debtor to fund its ongoing operating cash shortfalls or deficiencies. The Disclosure Statement should clearly identify the amount of the sales proceeds that are being diverted, the proposed use of those funds and the consequences of not being able to utilize these funds.

### B. The Disclosure Statement Fails to Adequately Describe the Significant Risk of Nonpayment to General Unsecured Creditors Based Upon the Terms of the Plan.

The Plan creates significant risk of nonpayment to General Unsecured Creditors ("GUC's") by withholding a substantial portion of the net proceeds of the sale of the Debtor's real estate to provide as working capital to the Debtor to finance its ongoing operations.

As noted above, the Committee calculates the withheld portion of the Net Sales Proceeds that, under the Plan, are to be diverted to cover the Debtor's ongoing operating losses, is approximately $1,570,000. Based upon the Debtor's estimate of total GUC claims of $11,732,835 (see Liquidation Analysis, Exhibit "7" to the Disclosure Statement), the Net Sales Proceeds being diverted to the Debtor would be sufficient to pay over 13% of the total GUC claims.

The Plan proposed to make up the diversion of over 13% of the funds to which GUC claimants are entitled by proposing monthly payments of $100,000 to GUC claimants until those claims are paid in full. The significance of this risk to GUC claimants can hardly be overstated, yet is not discuss in the Disclosure Statement.

The Committee's Financial Advisor, Brian Weiss, has calculated, based upon a review of the Debtor's own projections, that if the $1,570,000 in Net Sales Proceeds were paid over to GUC creditors instead of being diverted to the Debtor to cover its operating shortfalls, the Debtor would be administratively insolvent before the end of the first year following plan confirmation.

*See Declaration of Brian Weiss, at para.5.* By September, 2013, that insolvency would exceed $1,000,000. *Ibid.*

Moreover, the cash flow impact on the Debtor of the $100,000 post-petition payments offered to the GUC claimants is compounded by the significant lease payments that the Debtor will be obligated to pay to Greenlaw under the terms of the proposed sale, which total $307,000 per month. The Disclosure Statement fails to adequately apprise creditors of the Debtor's ability to pay these significant new obligations and discuss the risks to creditors of the Debtor's default. The Committee's Financial Advisor calculates that if, during the most recent nine months (the post-petition operation of the Debtor) the Debtor had been required to make the lease payments that it is obligating itself to make under the plan, the Debtor would have used $2,281,000 before any payments to the GUC. *See Declaration of Brian Weiss at para. 8.* Under these circumstances, the Disclosure Statement must analyze in detail the significant risk of default to the GUC, all facts and assumptions upon which the Debtor relies to conclude that it can meet its obligations under the Plan, and the likelihood of achieving the projections based upon recent historical operation of the Debtor.

### C. The Disclosure Statement Fails to Provide a Breakdown of the Anticipated Sale Expenses, Clearly Identify the Anticipated Net Sale Proceeds, and Cleary State How Net Sale Proceeds Are to be Used.

The Debtor's Plan is entirely dependent upon the proposed sale to Greenlaw. Surprisingly, however, the Disclosure Statement gives little information concerning the sale, and provides absolutely no discussion of the conditions to the sale, or risks that the sale may not close.

Furthermore, the Disclosure Statement does not provide a projected closing statement, or any breakdown of anticipated sale and closing costs, amount of net proceeds and anticipated distribution of net proceeds. The Disclosure Statement fails to clearly identify the amount of the anticipated sales proceeds that will be distributed to F&M Bank, or the amount that will be available for GUCs.

**D. The Disclosure Statement Fails to Describe the Dispute Concerning the Amount of the Claim of F&M Bank, or Discuss How the Resolution of that Issue Will Impact the Plan.**

F&M Bank is identified as class 1.2 in the Plan and is the holder of the first and second trust deed obligations encumbering the Garden Grove campus. According to the counsel for the Debtor and counsel for F&M Bank, the Debtor intends to object to F&M Bank's claim and will seek an order setting aside all default interest, late fees and similar charges. Per F&M Bank's counsel, the resolution of this issue could have a $4,000,000 impact on the amount of F&M Bank's claim.

The potential $4,000,000 swing in the secured claim of F&M Bank is clearly a material issue that will substantially affect the amount available for distribution to GUCs. If the amount available for distribution to GUC's is reduced by $4,000,000, that will mean that another 1/3 of the GUC's claims will remain unpaid, and will require that the $100,000 monthly payments to GUCs be extended for an additional period of over 4 years.

The $4,000,000 issue could even impact the Debtor's post-petition solvency. If F&M Bank's claim is $4,000,000 greater than anticipated by the Debtor, the amount available for the Debtor to retain under its plan to retain 15% of the net proceeds to cover its ongoing operating losses would be reduced by approximately $600,000, thereby potentially jeopardizing the Debtor's ability to remain solvent post-confirmation.

Furthermore, litigation over the claim could have the effect of significantly delaying the Debtor's ability to commence payments under its Plan. Litigation over the issue in Bankruptcy Court could take months, and appeals could mean that the issue would not be resolved for years after confirmation of a Plan. Yet the Disclosure Statement fails to even identify the issue, much less discuss the potential impact on the Debtor and the GUCs.

This $4,000,000 dispute with F&M, the potential impact of the resolution of this issue if the Debtor prevails and if the Debtor does not prevail, and the impact of time-consuming litigation over the issue, must be discussed in detail in the Disclosure Statement, or the Disclosure

Statement will clearly fail to contain adequate information.

E. **The Disclosure Statement Fails to Adequately Describe the Assumptions Upon Which Its Financial Projections Are Based, and Compare Projections to Recent Actual Operating History.**

The Committee's Financial Advisor notes the following significant issues that raise serious questions about the Debtor's projections:

(i) From 2006 to 2010, the Support/Revenue upon which the Debtor relies to fund its operations has declined by 59%.

(ii) From 2008 to 2009, the Support/Revenue decreased by $26,285,000 or 40%.

(iii) From 2009 to 2010, the Support/Revenue decreased by $9,884,000 or 24%.

(iv) From October 2010 through May 2011, the Debtor's Support/Revenue decreased by $5.7 million or 24% from the comparable period from October 2009 through May 2010.

(v) The Debtor's financial projections attached to the Disclosure Statement assume that Revenue/Support from November 2011 through May 2012 will only decrease by $423,000 or 3% from the comparable period from November 2010 through May 2011.

(vi) The Debtor projects that its operating expenses will decrease by $140,000 during this same period.

(vii) The Debtor projects that its cash flow will decrease by $284,000 during the November 2011 through May 2012 period, from the comparable November 2010 through May 2011 period despite the much smaller decline in revenues projected.

(viii) The Debtor's ability to meet its obligation during this period is highly dependent upon:

    a. Using the $1,570,000 diverted from the Net Sales Proceeds;

    b. Subleasing a building six months before the expiration of a lease to reduce its

rent obligations to Greenlaw by an aggregate of $617,778 during this period;

c.  Support/Revenue decline at significantly slower rates than recent history indicates;

d.  Implementation of additional cost reductions in January 2012 (as opposed to making those reductions immediately).

Significantly, *none* of these significant issues are discussed in the Disclosure Statement. Instead, the Debtor merely attaches its projections with little or no discussion management's plan or strategy to combat the declines in Support/Revenue, the assumptions upon which its projections were based or comparison of the projections to recent actual performance. Given the significant risk to the GUC, the Disclosure Statement should contain a thorough discussion of the assumptions that underlie the projections, the extent to which the assumptions are supported by or unsupported by recent operating history, and the factual basis for any assumptions that are unsupported by recent operating history.

**F.  The Disclosure Statement Fails to Adequately Describe the Sale.**

The Debtor values the Garden Grove campus on its Schedule D as having a current fair market value of $55 million. Yet the proposed sale is for only $46 million, only approximately 86% of the value of the Property according to the Debtor. Despite the apparently below market value sale price, the Debtor offers little information in its Plan and Disclosure Statement about what efforts the Debtor has undertaken to market its Property and ensure that the Property has adequate exposure to the market. The brief description contained on page 41 of the Disclosure Statement is insufficient to advise the creditors of the adequacy of the marketing efforts. Indeed, it appears that the Debtor is only now "in the process of" retaining a broker to market the Property. Without detailed disclosure of the nature of the marketing efforts, the creditors cannot determine whether the sale is likely to approximate the current fair market value of the assets being sold.

Additionally, the Disclosure Statement fails to describe any alternative or competing offers that the Debtor has received, which may be superior to the Greenlaw offer described by the

Debtor. It should be noted that the Greenlaw offer includes a substantial leaseback to the Debtor, as well as providing the Debtor a repurchase option to re-acquire a portion of its real estate. Disclosure of any competing offers may therefore provide important information to creditors as to the amount by which the leaseback/option provisions may have artificially depressed the sale price from its $55 million value. The Plan asks the creditors to bear a significant amount of risk of nonpayment by diverting 15% of the net sale proceeds to the Debtor for working capital and to obligate the Debtor to lease payments of $307,000 per month [we also know there will be a significant amount of idle space in the Family Life Center which the Debtor will be paying and fails to disclose], offering creditors monthly payments of $100,000 in return. Creditors are therefore entitled to full disclosure of all sale efforts and all offers received by the Debtor in order to adequately assess their risks and alternatives. The Disclosure Statement merely notes, "the Debtor has received several oral and written offers and other expressions of interest." The Disclosure Statement provides no further discussion or disclosure of those other oral and written offers.

G. **The Liquidation Analysis Included in the Disclosure Statement Is Inaccurate and Misleading.**

The Debtor's Liquidation Analysis estimates a distribution to GUC if the assets were liquidated under Chapter 7 of only 35.5%. The Committee believes this estimate is simply ludicrous and cannot be justified by any reasonable analysis of the value of the assets of this estate. Among the obvious devices utilized by the Debtor to artificially depress its estimated liquidation value include the estimate of a $41,400,000 sale value in Chapter 7 of the Debtor's real property. The Debtor's own Schedules estimated the value of the real estate at $55 million. The Committee is aware that the Greenlaw offer of $46 million has been matched or exceeded by several other offers. And the value of the Greenlaw offer is undoubtedly depressed by the leaseback/repurchase Option that would not be necessary if the Property were being sold in a Chapter 7 liquidation. Other unsupported tactics utilized in the Disclosure Statement's Liquidation Analysis to artificial depress the estimated distribution to the GUC include reducing

cash by operating shortfalls that would not be incurred in a Chapter 7.

The Committee's Financial Advisor had the following observations to the Debtor's Liquidation Analysis:

| Account Name | Deficiency | Impact to Creditors |
|---|---|---|
| Unrestricted Cash | • The cash balance is stated at $3,700,000. As of May 31, 2011, the balance was $4,301,798.<br>• Upon the liquidation of cash, the Debtor projects the cash balance available for distribution decreases by $1,346,800 | • The Debtor has grossly **understated** its cash balance available for distribution to creditors by $1,948,598 (difference between the May 2011 balances of $4,301,798 less the Estimated Liquidation Proceeds of $2,353,200). |
| Restricted Cash | • There is $1,090,645 of restricted funds held in a Morgan Stanley account that is secured by an $850,000 lien. The difference of $240,645 may available for distribution to creditors; however the Debtor failed to contemplate the liquidation of these assets and distribution of proceeds to creditors. | • The amount shown as available for distribution is **understated**. |
| Accounts Receivable | • The Debtor failed to contemplate the liquidation, collection and distribution to creditors of $42,810 of amounts due. | • The amount shown as available for distribution is **understated**. |
| Pledges Receivable | • Pledges receivable consist of non-contingent estate gifts (bequests). The Debtor has received notification from the estate of the donor they are the recipient of these funds. The Debtor failed to contemplate the collection and distribution to creditors of $1,063,541 of amounts due. | • The Debtor has grossly **understated** the collection of $1,063,541 of pledges for which the proceeds would be distributed to creditors. |

Case 8:10-bk-24771-RK    Doc 495    Filed 06/29/11    Entered 06/29/11 18:02:24    Desc
Main Document    Page 10 of 13

| Inventory | The Debtor has $669,285 of inventory consisting of the bookstore inventory, office supplies and offers to donor. The inventory in the bookstore is currently being sold, however the Debtor failed to contemplate the liquidation of the inventory and distribution of proceeds to creditors. | The Debtor has grossly **understated** the proceeds available to creditors. |
|---|---|---|
| Prepaid & Other Assets | The Debtor has $973,363 of prepaid expenses primarily consisting of prepaid broadcast airtime. Upon liquidation, a portion of this prepayment should be refundable however the Debtor has not contemplated these amounts. | The Debtor has grossly **understated** the proceeds available to creditors. |
| Real Property | The Debtor states the liquidation value of its real property is $42,300,000. The Committee has multiple parties interested in the real estate that would result in a minimum of $46,000,000 in proceeds to the estate. | The Debtor has grossly **understated** the proceeds available to creditors. |
| Furniture, Office Equipment and Vehicles | The Debtor has furniture, office equipment, vehicles, etc. with a book value of approximately $22,000,000; however the Debtor failed to contemplate the liquidation of these assets and distribution of proceeds to creditors. | The Debtor has grossly **understated** the proceeds available to creditors. |

The Committee's Financial Advisor has prepared a liquidation analysis (see Exhibit "2") based on review of the following information:

- Assets, liabilities and claims reported in the Debtor's Statement of Financial Affairs

- 10 -

- Monthly Operating Reports
- Plan and Disclosure Statement
- Letters of Intent to purchase the real estate assets
- Claim estimates provided by the Debtor's financial advisor

This analysis concludes in a "low" or "conservative" case, 100% of the creditor claims would be **paid in full** in a chapter 7 liquidation.

If the GUC would be paid in full in a liquidation of the Debtor's assets, and if the Plan is going to place the GUC under considerable risk by diverting over 13% or $1,570,000 of their claims to cover ongoing financial losses, while proposing to make up for the diversion of funds by offering risky monthly payments of $100,000 over time to the GUC, then the Disclosure Statement should contain an adequate, accurate Liquidation Analysis and an appropriate discussion of the risks of the Plan.

### H. The Disclosure Statement Fails To Adequately Describe Compensation of Insiders.

The post-confirmation compensation and benefits for Robert and Arvella Schuller are not clearly disclosed in the Plan and Disclosure Statement. Only by closely inspecting the supporting schedules to the financial projections provided by the Debtor's Financial Advisor to the Committee's Financial Advisor (not included in the Disclosure Statement) can it be determined that they are projected to receive combined salaries of $334,514 ($230,114 for Robert Schuller and $104,400 for Arvella Schuller). They are also board members and have historically had lavish compensation and fringe benefit packages. The Disclosure Statement should to describe in detail the compensation and benefits to be paid to any insiders and family members, and a detailed description of each person's duties and responsibilities.

The Plan and Disclosure Statement fail to describe the services provided and benefits to be received by other insiders. The Plan and Disclosure Statement do not, for example, describe the benefits to be received by Dr. Sheila Schuller Coleman and her husband.

The Plan fails to disclose any compensation for the independent members of the board of

directors and members of the audit committee. A reasonable compensation package will be required to attract competent persons to serve as independent directors on the board.

### I. The Plan and Disclosure Statement Inaccurately Describe Classes 1.2 and 1.3 as Unimpaired.

The Plan and Disclosure Statement describe the Classes 1.2 (F&M Bank) and 1.3 (Grant & BCG, LLC) as unimpaired. The Plan, however, provides that these creditors are "barred from pursuing their rights and remedies against the collateral until the end of the Sales Period." Because the Plan alters the legal, equitable or contractual rights of these creditors, they must be described as "Impaired." *See, 11 U.S.C. § 1124(1).*

### J. The Plan and Disclosure Statement Fail to Adequately Describe the Personal Property Assets.

The Plan and Disclosure Statement include significant provisions concerning sale of the Personal Property Assets, but provide no more than a cursory description of those assets. Since the sale of the Personal Property Assets is a significant provision of the Plan, those assets, and their estimated fair value should be described in detail in the Disclosure Statement.

### K. The Plan and the Disclosure Statement Should Vest Authority to Undertake Avoidance Actions in the Post-Confirmation Committee.

While the Plan diverts significant proceeds from the sale to cover ongoing operating shortfalls of the Debtor, the Plan vests the power to commence and prosecute Avoidance Actions in the Debtor.

Given the significant risk being imposed upon the GUC, and the Debtor's long history of protecting and providing for an entire cast of Insiders, the power to pursue Avoidance Actions post-confirmation should be vested in the Post-Confirmation Committee, which will have an actual interest in seeing to it that appropriate claims are actually pursued, rather than swept under the rug.

/////

/////

Based upon the foregoing, the Committee respectfully requests that approval of the Disclosure Statement be DENIED.

DATED: June 29, 2011          RINGSTAD & SANDERS LLP

By: /s/ Todd C. Ringstad
Todd C. Ringstad
Nanette D. Sanders
General Insolvency Counsel to the Committee of
Creditors Holding Unsecured Claims